1

2  CEDRIC JOSEPH SEVERINO, ESQ., Cal. Bar #247648
   LAW OFFICES OF CEDRIC JOSEPH SEVERINO
3  3827 WEST SUNSET BLVD, SUITE B
   LOS ANGELES, CA 90026
4  Tel. (323) 630 3628, Fax (818) 648 0228,
   E-mail: CedricSeverino@gmail.com
5
   Attorneys for Plaintiffs
6  Kazenercom TOO, Association of Kazakh Investors and Entrepreneurs;
   Public Foundation Our House Kazakhstan; Kinozhuz; Yerkin Bektayev;
7  Berik Bektay; Kanet Meirmanov

8           IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF CALIFORNIA
9             SOUTHERN DIVISION—SANTA ANA

10 ┌──────────────────────────────┬──────────────────────────────
   │ KAZENERCOM TOO; ET AL.       │ CIVIL ACTION No. 09cv-00059 JVS (MLGX)
11 │    Plaintiffs                │
12 │ v.                           │ **VERIFIED THIRD-PARTY**
   │                              │ **COMPLAINT AND**
13 │ TURAN PETROLEUM, INC.; ET AL.│ **CROSS-CLAIM**
   │    Defendants                │
14 │                              │ **BY YERKIN BEKTAYEV AND**
   │                              │ **KANET MEIRMANOV**
15 ├──────────────────────────────┤
16 │ TURAN PETROLEUM, INC.        │ **FOR RELIEF BASED ON:**
   │    Defendant and Counterclaimant, │
17 │                              │   1. VIOLATION OF SECURITIES
   │ vs.                          │      LAWS;
18 │                              │   2. CONVERSION;
   │ YERKIN BEKTAYEV and KANET    │   3. BREACH OF CONTRACT;
19 │ MEIRMANOV,                   │   4. FRAUD AND
   │    Plaintiffs and Counterdefendants │      MISREPRESENTATION;
20 │                              │   5. UNJUST ENRICHMENT;
21 ├──────────────────────────────┤   6. CIVIL CONSPIRACY;
   │ TURAN PETROLEUM, INC.,       │   7. FRAUDULENT
22 │    Defendant and Third-Party Plaintiff, │      CONVEYANCES;
   │                              │   8. ACCOUNTING;
23 │ vs.                          │   9. DECLARATORY RELIEF
24 │ WELLS FARGO, N.A., YERKIN    │
   │ AKKUZOV, SABIRGAN            │
25 │ DUHALIEV, IGOR MAXIMOV       │ DEMAND FOR JURY TRIAL
   │    Defendants in Third-Party Complaint │
26 └──────────────────────────────┴──────────────────────────────

27

28

DEFENDANTS' COMPLAINT AND CROSS CLAIM

YERKIN BEKTAYEV and KANET MEIRMANOV,
  Counterdefendants and Third-Party Plaintiffs

vs.

ASIAN PACIFIC OIL & GAS LTD (incorporated in the Seychelles Islands); AMIRGAN DZHAKISHEV, ADILGAN DZHAKISHEV; YURI VANETIK; ROBERT VAN DUREN; ROBIN BISARYA; OKKE FINANCIAL LTD; ALCINA COMPANY CORP, PINGTON INVESTMENT LTD. (all three Belize); PINE BROOK S.A., HINES INVESTMENTS S.A. (both Panama); ESSEX MANAGERS LTD., VARRIAL FINANCIAL TRADING LTD. (both British Virgin Islands); COAST FINANCE LTD. (Bahamas); FREEMAN FREEMAN SMILEY LLP

  Third Party Defendants

## I.  NATURE OF ACTION

1.     Pursuant to Federal Rule of Civil Procedure 14, Plaintiffs and Defendants in Counterclaim Yerkin Bektayev and Kanet Merimanov respectfully file their Third Party Complaint in connection with the Counterclaim against them filed in this action on March 9, 2009.

2.     This is a third party complaint for relief both in law and in equity that seeks monetary damages, punitive damages and injunctive relief.  Defendants in Counterclaim and Third Party Plaintiffs herewith allege as follows:

3.

## II.  PARTIES IN THIRD PARTY COMPLAINT

1

DEFENDANTS' ANSWER TO THRANE'S COUNTERCLAIM

4.      Defendant in Counterclaim and Plaintiff in this Third Party Complaint YERKIN K. BEKTAYEV (hereinafter "Bektayev") is a citizen of Kazakhstan, engaging in business in Kazakhstan and internationally, with the address: c/o Kazenercom TOO (hereinafter "KEC"), Dostyk 33, #2, Almaty, Kazakhstan.  At the relevant times, Bektayev was the Director of KEC, as well as the President of Turan Enerpetroleum TOO.

5.      Defendant in Counterclaim and Plaintiff in this Third Party Complaint KANET MEIRMANOV (hereinafter "Meirmanov") is a citizen of Kazakhstan, engaging in business in Kazakhstan and internationally, with the address: c/o Kazenercom TOO, Dostyk 33, #2, Almaty, Kazakhstan.  At all relevant times, Meirmanov was the employee of KEC and a stake holder therein, he also assisted in setting seismic tests for the project at issue.

6.      Both Plaintiffs in this Third Party Cross-Claim were elected on February 19, 2009 as the interim directors of TURAN PETROLEUM, INC. (hereinafter "Turan") which is a corporation organized under the laws of the State of Nevada, #          , pending its liquidation and institution of receivership.

<u>Seychelles Offshore Company Used for Fraudulent Transfer of Stock</u>

7.      Defendant in cross-claim ASIAN PACIFIC OIL & GAS LTD. (hereinafter "APOG") is a shell company organized under the laws of Seychelles Islands, i.e. Registration Number No. 050476, registered address located Suite 1, Mec Complex, Avenue D'Arhoa, Providence, PO Box 1004, Victoria, Mahe, Seychelles.  APOG engages in business in the U.S. and internationally, being, on information and belief, defendant Askar Karabayev's ("Karabayev") alter ego or is affiliated with him.  APOG is subject to

2

jurisdiction of this court because it was used for the unlawful transfer of, at a minimum, 20% of the assets represented by the rights under the Concession (see sopra), *because* it received monies originated from Turan's assets in California, and because APOG was used for laundering proceeds of the conspiracy, specifically at the time when this action was already pending.

8.     Defendant AMIRGAN DZHAKISHEV (hereinafter also "Dzhakishev") is the local agent of APOG in Kazakhstan, at 30 Rubinshtein Street, Almaty, Republic of Kazakhstan. Dzhakishev is subject to the jurisdiction of this Court, because he is a nominee of APOG, who was involved in the unlawful transfer of Turan's stock, processing the receipt of certain proceeds that were originated in California, and because he acted knowingly, to violate the laws of California Uniform Fraudulent Transfers Act, i.e. Cal. Civ. Code §3439 (hereinafter "CUFTA") and of other law and damaged plaintiffs herein.

9.     Defendant ADILZHAN DZHAKISHEV (hereinafter also "Adilzhan") is another director of APOG and an agent in Kazakhstan, at: 30 Rubinshtein Street, Almaty, Republic of Kazakhstan.  Adilzhan is subject to the jurisdiction of this Court, because he is a nominee of APOG, who signed an agreement on the transfer of TEP's rights by Karabayev to APOG, and was involved in the unlawful transfer of Turan's assets, processing the receipt of certain proceeds that were originated in California, and because he acted knowingly, to violate the laws of California Uniform Fraudulent Transfers Act, i.e. Cal. Civ. Code §3439 (hereinafter "CUFTA") and of other law, and damaged plaintiffs herein.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

10.     Defendant YURI VANETIK (hereinafter also "Yuri") is an individual residing at 18301 Von Karman Avenue, #1050, Irvine, CA, 92612, who engaged in business in California and who was the organizer of Turan. Yuri is subject to the jurisdiction of this court because he was involved in the unlawful transfer of Turan's assets, was involved in processing the receipt of certain proceeds that were originated in California, and because he acted knowingly, to violate the laws of California Uniform Fraudulent Transfers Act, i.e. Cal. Civ. Code §3439 (hereinafter "CUFTA") and of other law, and damaged plaintiffs herein.

11.     Defendant ROBERT VAN DUREN (hereinafter also "Van Duren") is an individual who, until about May of 2008, held himself out as Turan's director, residing at 3720 S Susan St, Santa Ana, CA 92704-6967, and at 812 Monticello Dr. Naperville, IL 60563-3228. Van Duren was an active participant in the securities fraud schemes; his signature can be found on most of the unlawfully issued stock certificates, including "duplicate certificates" and facilitated offshore fraudulent transfers (see below). This Court has jurisdiction over Van Duren he acted knowingly, to violate the laws of California Uniform Fraudulent Transfers Act, i.e. Cal. Civ. Code §3439 (hereinafter "CUFTA") and of other law, and damaged plaintiffs herein.

12.     ROBIN BISARYA (hereinafter also "Bisarya") is an individual who has held himself out as a director of Turan and its treasurer, with the address: c/o 940 South Coast Dr., Suite 100, Costa Mesa, CA 92626. Bisarya was the signatory on the account, from which about $2.5 million was wire transferred out in February of 2009, and, on information and belief, dissipated. This Court has jurisdiction over Van Duren he acted

4

knowingly, to violate the laws of California Uniform Fraudulent Transfers Act, i.e. Cal. Civ. Code §3439 (hereinafter "CUFTA") and of other law, and damaged plaintiffs herein.

<u>Belize Offshore Corporations Used for Fraudulent Transfers of Stock</u>

13. OKKE FINANCIAL, LTD. (hereinafter also "Okke") is a shell company organized under the laws of Belize, IBC No. 15768, that engages in business in the U.S. and internationally, being, on information and belief, Karabayev's *alter ego*. Okke's address is at: Morgan & Morgan Trust Corp. (Belize) Ltd., 35 A Regent St., Belize, Belize. Okke is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

14. ALCINA COMPANY CORP. (hereinafter also "Alcina") is a shell company organized under the laws of Belize, IBC No. 52723, that engages in business in the U.S. and internationally, being, on information and belief, Karabayev's *alter ego*. Alcina's address is at: Sucre & Sucre (Belize) Ltd., 60 Market Square, Belize, Belize. Alcina is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

15. PINGTON INVESTMENT, LTD. (hereinafter also "Pington") is a shell company organized under the laws of Belize, that engages in business in the U.S. and internationally, being, on information and belief, Karabayev's *alter ego*. Pington's address is at: Morgan and Morgan Trust Corporation (Belize), Ltd of 35A Regent Street, Belize City, Belize. Pington is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

5

<u>British Virgin Islands Offshore Companies Used for Fraudulent Transfers of Stock</u>

16.     VARRIAL FINANCIAL TRADING, LTD. (hereinafter also "Varrial") is a shell company organized under the laws of the British Virgin Islands, at: Overseas Management Co. Trust (BVI) Ltd., R.G. Hodge Plaza 2nd Floor, P.O. Box 31152 Road Town, Tortola, the BVI, IBC No. 425957. Varrial engages in business in the U.S. and internationally, being, on information and belief, Karabayev's *alter ego*. Varrial is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

17.     ESSEX MANAGERS, LTD. (hereinafter also "Essex") is a shell company organized under the laws of the British Virgin Islands, at the present registered agent's address: c/o Blenheim Trust (BVI) Ltd., R.G. Hodge Plaza P.O. Box 3161, Road Town, Tortola, the BVI, IBC No. 517296. Initially, it was incorporated on October 14, 2002, then upon an interval when the agent's fees were not paid, it was reinstated, effective since January 1, 2007. Essex engages in business in the U.S. and internationally, being, on information and belief, Vanetik's *alter ego*. That included the time period when Essex was incapacitated in the BVI and had no power to transact business. Essex is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

<u>Panama Offshore Companies Used for Fraudulent Transfers</u>

18.     HINES INVESTMENTS, S.A. (hereinafter also "Hines") is a shell company organized under the laws of Panama on May 14, 2007, as company #E-8-92422, 81103/4162, 567600, agent Ronny Cohen. Hines engages in business in the U.S. and

6

internationally, being, on information and belief, Vanetik's *alter ego*. Hines is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

19.     PINE BROOK, S.A. (hereinafter also "Pine Brook") is a shell company organized under the laws of Panama, registered on March 16, 2007, as company #8-491-274, 44607/4122, 559862, agent Brigido Navarro. Pine Brook engages in business in the U.S. and internationally, being, on information and belief, Vanetik's *alter ego*. Pine Brook is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

<u>Bahamas Offshore Corporation Used for Fraudulent Transfers</u>

20.     COAST FINANCE, LTD. (hereinafter also "Coast") is a shell company organized, on information and belief, under the laws of the Bahamas[1], IBC No. 8376C. Coast engages in business in the U.S. and internationally, being, on information and belief, Karabayev's *alter ego*. Coast is subject to the jurisdiction of this court because it was used for fraudulent transfers of the assets of Turan, in violation of the California's CUFTA and other laws.

21.     FREEMAN FREEMAN SMILEY LLP (hereinafter also "FFS") is a partnership of attorneys at 3415 Sepulveda Blvd, Los Angeles, CA 90034. FFS is defendant in this Third Party Complaint because FFS has refused to cease unlawfully holding itself out as Turan's attorney, has refused to transfer the files to the Interim Board of Turan, or to deposit unlawfully obtained fees into this Court or to Turan, subject to restitution to bona

---

[1] Disclaimer: information received on the telephone from the registry of the companies in the Bahamas; Plaintiffs have not yet received the copies of the records for that company.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

fide shareholders, as demanded, including by a demand letter of March 2, 2009. FFS knew at all times that it had no right to represent Turan, but knowingly did so, refused to answer cease and desist demand, to transfer the files, or to deposit unlawfully obtained fees into the Court, as demanded.

### III. JURISDICTION

22.     This Court also has jurisdiction pursuant to 28 U.S.C. §1331, 1337 and §27 of the Securities Exchange Act 15 U.S.C. §78aa, as well as 15 U.S.C. §78i, 15 U.S.C. §77z-1. Namely, Defendants used a Notice of Sale of Securities, published with and/or through the Securities and Exchange Commission.   Defendants further transacted business marketing securities and made public offerings of securities, within the meaning of a proper venue pursuant to 15 U.S.C. §77v.

23.     Each and every of the Defendants in this Cross-Claim was involved in violation of the filing requirements with the SEC.   That includes FFS that got involved with the activities of purported former directors of Turan, advised them on the securities law, but refused to compel compliance with the law, adding to the misrepresentations and concealment. (See Exhibits D-F).

24.     In connection with the acts alleged in this Third Party Cross-Complaint, Third Party Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.  The amount in controversy, exclusive of interest and costs, is in excess of $75,000.

25.     This Court's jurisdiction is proper under 18 U.S.C. §1512, 'Tampering with a witness, victim, or an informant', as shown below.

8

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

## IV.  LITIGATION AMONG VARIOUS DEFENDANTS IN INITIAL

## COMPLAINT

26.     After this action, initially Docket No. 08cv1339, filed in the U.S. District Court for the District of Columbia on August 4, 2008, the internal conflicts among the Defendants erupted, and they started litigation among themselves, essentially admitting by verified pleadings most of the allegations by Plaintiffs.  Their pleadings essentially exposed multiple frauds and that Turan was little else than a Ponzi scheme, whose operators now started to attribute the blame for the corporate malfeasance to the other members of the enterprise, seeking to shift the liability to other Defendants.

27.     About three weeks after this action was filed, on August 20, 2008, Vanetik filed an action against Turan, Karabayev, Voloshin and Turan's purported treasurer Robin Bisarya (see below) at the District Court for Clark County in Las Vegas, Nevada.

28.     The allegations verified by Vanetik in that action, styled *Anatoly Vanetik v. Akar Karabayev, Robin Bisarya, Naum Voloshin and Turan Petroleum, Inc.*, Docket A570078, are deemed admitted by him, and his verified complaint is referred to hereinafter "the Vanetik Complaint".

29.     On September 22, 2008, an intervening party, Trek Resources, Inc. (hereinafter "Trek") filed a complaint in intervention and a motion to join in Vanetik's action in the same court in Las Vegas.  That complaint in intervention was verified by Kushnerenko. These allegations are also deemed admitted by Trek and Kushnerenko, and that complaint is referred to hereinafter as "the Trek Complaint".

9

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

30.    On October 23, 2008, Turan (acting without corporate authority, believed by be initiated by a private party Karabayev) filed an action against Yuri Vanetik; Anatoly Vanetik; Hiep T. Trinh; Dean Miller, Judy Trinh, Larry Alan Du Vall, NRG Resources, Inc. (Nevada); Valueluck.Com, Inc. (Delaware); Essex Managers Ltd. (BVI); Capital Marketing Systems, Inc.; Private Equity Management, Inc.; 888 Capital, LLC; American Heritage Funding LLC; Archer Resources (all six Nevada); Pine Brook S.A. and Hines Investments, S.A. (both Panama).

31.    That action was brought in the U.S. District Court for the Central District of California, Docket 08cv01707. The allegations by Turan are also deemed admitted by Turan, and that complaint is referred to hereinafter as "the Turan Complaint".

32.    In the action *Turan v. Yuri Vanetik et al.*, Vanetik and the others claimed *forum non conveniens* in Los Angeles, CA, and moved to stay it pending the resolution of the prior action in Las Vegas, designating proforma as defendants in counterclaims Karabayev, Voloshin and Bisaria, as "malfeasing officers/shareholders/directors" of Turan. Likewise, Karabayev and others have moved in the Las Vegas action claiming it to be *forum non conveniens*. Otherwise, Defendants in turn claimed that both Las Vegas and Los Angeles were *fora no conveniens* to resolve their internal claims.

33.    Turan and others have been also subject to three more lawsuits by its shareholders, who claim they were defrauded by Turan and its operators, demand to return their investments and damages. Those allegations underscore that Turan was operated essentially as a Ponzi scheme, in which investors were lured by promising extraordinary profits, but ultimately to lose their investments.

10

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

34.     All of the above complaints against each others at Turan have alleged fraud of the other parties, with great specificity.   With regard to the manner of fraud committed on Bektayev and Meirmanov, the complaints have admitted that those were defrauded, in particular by way of substituting their Certificates of stock (held today).   Apparently Certificates Nos. 93 and 95, most relevant in this action, were falsely declared under oath as if lost and were substituted by fraud, backdated and showing the identical dates.   See Exhibits B-C, showing the back-to-back duplicate Certificates of the same dates.

35.     Summarizing the admissions, Cross-Defendants then sold and/or fraudulently transferred the Cross-Plaintiffs' holding rights under Certificates Nos. 93 and 95, representing the controlling rights under the Concession (see below).   Defendants misappropriated proceeds, in particular, through Hines Investments, S.A. and Pine Brook S.A., both Panamanian offshore companies, Okke Financial Ltd. Alcina Company Corp., and Pington Investments Ltd., all three being Belize offshore companies.   On admissions, more than $5 million was routed to those offshore accounts.

36.     At all relevant times, FFS served to Karabayev as a legal analyst with regard to those unlawful transfers.   FFS further provided advice that encouraged fraudulent transfers.   For example, FFS's Memorandum of July 31, 2008 shows that FFS was the 'think-tank' behind these activities to defraud.   On information and belief, FFS also created a Chart in cooperation with Karabayev.   That Chart said "Attacks on Bektayev in Kazakhstan Have to Be Restarted.   Criminal".   See Exhibit F.

37.     The essence of all current litigation is the original underlying fraud by Vanetik, through the issuance of restricted Turan common shares, to gain control of the Arys

11

DEFENDANTS' ANSWER TO TURANS COUNTERCLAIM

license for the purpose of securities fraud and conversion. The initial act of fraud was Vanetik's act of fraud to defraud Bektayev and KEC of their 100% interest in the Arys Concession license.

38.   As the chronology of events outlined below demonstrate, as a result of the activities of the Third Party Defendants, Bektayev and Meirmanov were defrauded of their interest in under the Concession. On information and belief, Bektayev, a highly undesirable witness to the fraud and conversion of Vanetik and Karabayev, and holder, together with KEC and Meirmanov, of the original stock Certificates, Nos. 83, 93 and 95, representing 54% of the authorized capital in Turan, was repeatedly threatened and became the victim of two murders attempts.

39.   These acts of fraud and disinformation continue today, even involving FFS, and include the serious misrepresentation, before this Court, of the financial situation of Turan through the statements filed with this court, suggesting dire financial peril for Turan if the $1.5 million frozen in Turan's account is not immediately released. Bank records from 5 February 2009 show a balance in the account on that date of $4, 006,048.21. See Exhibit G. Evidence of potential wire fraud and continued abuse of the court process.

## V. FACTS COMMON TO ALL COUNTS

### (a) Underlying Facts Concerning Oil Exploration in Kazakhstan

40.   Kazakhstan, a country situated in Central Asia, has considerable reserves of extractable oil and gas, some discovered and being developed, and some being in the stage of exploration.   The Government of Kazakhstan has encouraged investments for exploration and development of oil and gas reserves, using the mechanism of contractual

12

concessions for certain selected plots, to explore and extract oil and gas yet to be confirmed, for up to 25 years' of a concession's duration.

41.     In 2001, the Kazakh Government entered a Concession Agreement (hereinafter "the Concession") with Aral Petroleum Co. (hereinafter "Aral Petroleum"), a company organized under the laws of Kazakhstan.  The subject matter of the Concession was the exploration and development of the oil and gas resources on the territory 22,000 sq. km, or approximately 5 million acres, mainly in Shymkent region, with a minor part in Kzylorda region in Kazakhstan.

42.     Various geological surveys and seismic tests in Kazakhstan have provided reasonably reliable indications that the estimated reserves of oil and gas in that Concession of 5 million acres may constitute up to 300 million tons (ca. 2,250 million barrels) of crude oil.

43.     Under that scenario, the value of the untapped oil reserves within the Concession may exceed $2 billion in current crude oil prices, with relatively low costs of drilling and extraction in Kazakhstan.   The duration of the Government's Concession (the total duration of 25 years) allowed to extract that volume and to generate profits ultimately to exceed $1 billion.

44.     In about May of 2004, Aral Petroleum ("Aral") created a joint venture with KEC, agreeing to endow a newly established Turan Enerpetroleum TOO ("TEP"), a corporation organized under the laws of Kazakhstan. TEP was vested with the rights in the Concession. Aral Petroleum and KEC agreed on a 51/49 interest apportionment between them as to the rights in the Concession agreement, under which KEC had the priority right

DEFENDANTS' ANSWER TO THE ANS' COUNTERCLAIM

1    to control the 49% of the Aral's stake, having prepaid that option.  KEC paid cash for

2    51% to Aral Petroleum on March 18, 2005.

3                        (b) Fraudulent Scheme of Stock Distribution and Conversion

4

5    45.    Elite Registry Inc. ("Elite") was a dormant shell entity, incorporated by Vanetik

6    and Yuri in March of 2001 under the laws of the State of Nevada, with the registered

7    agent at: 502 North Division St., Carson City, NV, 89703.  On about December 28, 2004,

8    Elite, in accordance with the "4-phase plan", whose mastermind was Yury Vanetik,

9    Vanetik's son, in cooperation with Vanetik was, then was reregistered in the State of

10   Nevada, now as Turan.

11

12   46.    In the e-mail on November 19, 2004 (admitted in the Turan complaint in this Court

13   of October 23, 2008, Yuri outlined a Four-Phase Plan:

14

15       "Summarizing the discussions we had on Thurs Nov 19, below is a list of steps we
         would need to go through to prepare a gray market company for the Kazakhstan oil
16       deal...

17       Phase I – Merger Entity Created (1-2 weeks)
         1.     Identify a Nevada or Delaware Entity that is: a. Over 2 years old; b. Clean;
18       c. Has at least several shareholders who have been holding shares for over 2 years
         and are not affiliated holding less than 10%; d.  Has a business plan...
19       2.    Reinstate in Nevada or Delaware and change name Turan Petroleum, Inc.
         (Turan)
20       3.  Open bank account and file SS4 (if never filed)
         4.  Obtain opinion letter re tradable shares
21       5.  Obtain expedited CUSIP #
         6.  Moodys or S&P
22       7.  Transfer Agent
         8.  Broker
23       9.  NASD symbol

24       Phase II – Combination (2 weeks) ...
         1.  [Investor] acquires shares in Turan, providing additional working capital for
25       audit and legal
         2. Draw up merger agreement where Turan acquires [the Concession]...
26       3.   Shares issued to Kazakh side (49%) and to US group (Tony [Vanetik], ...,
         Miller, ... Hiep Trinh, etc.)

27       Phase III – Move to Pinks and Audit (2-3 months)
         ...
28

                                            14

                        DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

4. Publish info on pinks
5. Press release (PR web, etc.)
6. Set the price on the pinks high (i.e. $10) with virtually no trading."

47.   The authorized capital of Turan was declared 50 million shares.   On or about December 14, 2004, Vanetik distributed 16.4 million shares of Turan stock to 9 individuals, pursuant to the Board decision, signed by Vanetik, as follows: Vanetik: 2.8 million shares (increasing his holdings, based on Elite's stock, to 5.9 million); Yuri: 1.6 million shares (increasing his holdings to 2.7 million); Valueluck: 2.8 million shares (increasing its holdings to 3.9 million); Miller: 1.6 million shares; and Kushnerenko: 0.4 million shares.

48.   While Elite was a shell company, the purported "subscription agreement" for 10 million founders shares entailed no consideration.   No record of subscription agreements have been, admittedly, found in Turan's records.   Most of the "founders' shares" were distributed by Vanetik to satisfy various parties having no connection with Turan's business.

49.   Vanetik and Yuri, as the persons in control, undertook the undisclosed further distribution of shares, based on Elite's distribution, among themselves:   Vanetik: 3.1 million shares, Yuri: 1.1 million, Valueluck: 2 million, Trinh: 1.2 million Geoffrey Fiala ("Fiala"): 1.1 million, Joseph Weaver ("Weaver"): 0.2 million, Franklin Wolfson ("Wolfson"): 0.1 million.

50.   In fact, none of these "founders" of Turan had the basis for distribution of shares in that capacity.   For example, Fiala (see the preceding paragraph) was unaware that he had been designated as a founder of Turan. Fiala never received the Turan share certificates in his name.   Reportedly, Vanetik told Fiala that the 1.1 million shares of Elite was

15

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

remuneration for Fiala's work and investments in One Point Inc. and Accel Data, Inc., Vanetik's other unsuccessful companies. However, in April of 2005, Vanetik told Fiala that he had given to him too many shares and reclaimed 860,000 shares.

51.    These Turan's insiders, however, then sold these shares for millions of dollars in an illegal third party distribution, as cited below.

### (c) Fraudulent Trading to Inflate Stock Price in April of 2005

52.    On January 7, 2005, Turan's Board of Directors empowered its Director General Yedil Kassymov ("Kassymov") to be a liaison officer with officials of the Government of Kazakhstan on the issues of the Concession.

53.    On February 14, 2005, Turan posted a public Notice of Sale of Securities through the Securities Exchange Commission (SEC) in Washington, D.C., publishing its address at: 3720 South Susan St., #100, Santa Ana, CA, 92704.   SEC granted Turan I.D. #0001317906.  Turan's Notice of Sale of Securities [under Regulation D and Section 4(6) of the Securities Act of 1933], Item 06, provided, however, very little information.

54.    On February 28, 2005, KEC and Turan entered an agreement on Turan's priority to acquire 51% in TEP, consequently in the Concession, setting the terms for Turan's participation.   Namely, Turan and KEC concluded an Agreement under which Turan received 51% of TEP's stock. On March 18 2005 KEC paid through the bank to Aral for 51 % in TEP.

55.    On March 14, 2005, Aral transferred, with permission of KEC, 51% of stock in TEP, in accordance with the February 28 Agreement. On April 20, 2005, that transfer of the 51% stock in TEP was registered at the Department of Justice of Kazakhstan.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

56.     On March 26, 2005, a second agreement was made by e-mail between the same parties. It stated supplemental terms for KEC's remuneration in the U.S. Upon Vanetik's insistence, Bektayev and Kassymov signed it for KEC. Unknown to Bektayev, Kassymov was in fact an insider for Turan in that transaction, he held a Power of Attorney and acted for both parties in the same transaction.

57.     In about late April of 2005, Turan was listed by Vanetik, Yuri and other operators on the Pink Sheets, as directed by Yuri in his e-mail about a 4 phase plan, cited above. The price was indeed set at $12.50 per share, using one or two minimal transactions with some 100 shares, shown on the Pink Sheets. This was done to attract investors and inflate the value of stock given to various contractors.

58.     However, by Turan's own admission, since its inception, Turan had no revenues, other than the proceeds for the sale of a part of another concession, for $300,000, to Russian Angel Acquisition LLP. From the start, Defendants never intended to make Turan a viable business, but used investments in a Ponzi scheme, to attract and divert investors' proceeds to their own use, including through the accounts of Panama offshore entities in Switzerland, and to spend on the business purposes as little as possible, just to create an appearance that something was being done under the Concession. However, none of the oil wells, by far the largest item of all expenses (costing from $1-8 million each) was drilled.

### (d) Fraud of Providing Void Securities for Acquiring Rights Under Concession

59.     For Turan to purchase the 100% interest in the Concession, Vanetik proposed to Bektayev to compensate his interest in TEP by transferring 26,181,380 shares in Turan

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

(only 50 million authorized capital and which represented a majority of stock). That purchase contract also included an option on 10 million common shares in Turan that could be exercised later, however, on information and belief, Vanetik did not intend to make that option available to Bektayev, as no option agreement contract was ever sent to Bektayev, and Vanetik converted that option. Additionally, 3 million shares were given to Kassymov, who later died. (see below).

60.    Out of that consideration, 24,381,862 shares in Turan were to be held through a Nevada company, Trek Resources, Inc. ("Trek"), in a restricted form. Additionally, 2,618,138 shares in Turan were issued directly in Bektayev's name.

61.    All of Turan's 26,181,380 shares so issued, ostensibly for the benefit of Bektayev, were in fact restricted stock, without the holder's right to sell these shares on the real and legitimate market for 2 years, only after which that restriction was supposedly to expire pursuant to a registration statement to be filed by Turan, but never filed.

62.    According to Vanetik's misrepresentations by e-mail, in particular to Bektayev on April 14, 2005, and Vanetik's misleading oral statements, a true value of the Turan stock could be ascertained from public sources such as Bloomberg and Zacks. That value was shown by those sources as though the market value of Turan's shares was $12.50 a share, consistent with Yuri's 4-phase plan cited above.

63.    Given that listed stock quote price, the Turan stock package ostensibly transferred to Bektayev and KEC translated into the alleged value of about $304,773,275. In fact, that valuation was artificially inflated and created by Vanetik (as Turan's President and Chairman of the Board) and other Defendants who used isolated transactions between

18

insiders for sophisticated manipulations resulting in that published information, as described in more detail below.

64.    Additionally, between June 15-25, 2005, Vanetik committed Turan in writing to undertook to pay $450,000 to KEC, upon KEC providing the backup invoices, which invoices were subsequently presented to Vanetik in the presence of Dr. Judith Lentin, a contractor to Turan.   After various excuses, that amount was ultimately never paid.

65.    To set up KEC's and Bektayv's holding rights in Turan, on April 19, 2005, Trek was incorporated under the laws of the State of Nevada, with the registered agent's address at: 502 North Division St., Carson City, NV, 89703 (the same as Turan). Bektayev was named its initial and sole director, president and secretary-treasurer, and sole shareholder.   Vanetik used his exclusive contact with the registered agent in Carson City, Nevada, to manipulate the Trek registration documents so as to remove Bektayev as an officer and director, and to place in his stead, Alexander Kushnerenko and others, proxies for Vanetik, thereby fraudulently depriving Bektayev of his proper consideration for his ownership in the Arys license.

66.    On April 27, 2005 Kassymov (acting in the name of Turan and TEP) misrepresented to all parties concerned that he had a permission from the Government of Kazakhstan to transfer 49% from KEC to Turan, even though this was untrue.   With Vanetik essentially made Kassymov Turan's agent, concealing the true facts from KEC. Turan later paid to Kassymov $102,000, which was also not disclosed to KEC.

67.    On May 25, 2005, Turan and KEC signed an Agreement on the sale of 49% (together with the prior 51% adding up to a full 100% acquisition).   That agreement was

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

to be governed by Kazakh law.   That agreement cited supplemental terms, as a precondition for the registration of Turan's 100% control of TEP in order to fulfill the Agreement from March 26, 2005.

68.    On June 1, 2005, Turan's Board of Directors, Vanetik and Robert Van Duren, CEO, issued a letter of guarantee to KEC to pay $450,000, as evidence shows, never meant to be paid.

69.    On June 15-25, 2005, Bektayev and Kassymov traveled to the U.S.  Vanetik gave to Bektayev the Trek incorporation documents.  Vanetik declared that Bektayev was the only incorporator, president and the sole shareholder of Trek.  Vanetik also declared that Bektayev was now the sole owner of Trek and held the title to the respective stake in Turan, whose restricted shares were issued to Trek.

70.    For confirming that transaction, Vanetik gave to Bektayev a blank certificate for 100,000 shares of Trek and offered to Bektayev to sign that certificate twice, as Trek's president and as its secretary.  Relying on Vanetik's fiduciary duty, Bektayev did so, as he was instructed.

71.    Turan's complaint of October 23, 2008 (filed without authority) admitted in express terms that fraud, as follows (¶106: "During the period from in or about July 2005 through August 2005, Tony Vanetik caused Turan to transfer 24,381,862 shares of its stock to an entity, named Trek… Vanetik fraudulently induced Turan to transfer these shares to Trek by misrepresenting to Turan that the shares were to be used to fulfill a certain apparent obligation of Turan to a third party (added: KEC and Bektaeyv), upon

20

information and belief.  However, Tony Vanetik caused these shares to be passed through Trek so that they were not used to satisfy said apparent obligation of Turan."

72.     Fraud on Bektayev and KEC was preplanned.  Trek was organized, however, as an entity in the category of a 'small business corporation', in which *nonresidents* had no right to be shareholders.  In particular, this prohibition is cited in the IRS Instruction #2553, at ¶4.  Furthermore, the authorized capital of Trek was not 100,000 as on the certificate, but 75,000,000 shares.

73.     Therefore, even if the Certificate given to Bektayev were valid (which it was not), it translated to less of 1% of Trek's authorized capital.  Furthermore, a small business corporation was not required to use an agent for stock transfers, which facilitated fraud.

74.     As a result, Bektayev was a victim of concealment and fraud.  Vanetik asked Bektayev to sign a stock Certificate in the name of Trek, which Certificate was automatically void, as signed by a nonresident alien.  At the same time, some other unknown stock of Trek was issued.  Instead of the promised 100% stake in Trek, Bektayev was given just 0% of interest in Trek; his control in Turan, through Trek, was, as a result of blatant fraud, void from the start.

75.     Based upon false representations by Turan's principals on consideration being paid, on June 24, 2005, 100% interest of Turan in TEP was registered with the government bodies of Kazakhstan.

76.     On August 8, 2005, Vanetik and Van Duren directed, on Turan's letterhead, a letter to KEC, stating a guarantee from Turan and citing the Certificate of shares, made to Bektayev, as well as Turan's restricted shares issued to Trek, with the shares' numbers.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

77.     More specifically, Vanetik and Van Duren wrote to KEC and Bektayev: "Yerkin, As per our agreement Turan (…) is guaranteeing the issuance of a total of 30,000,000 common shares of Turan (…) in return for the transfer of 100% of the stock of Turan Enerpetroleum.   To date, we have issued 2,618,138 shares in 1 certificate, 2,618,138 shares in a 2[nd] certificate and 9,800,000 shares in a third certificate.   The balance of 14,963,724 remains to be transferred.  We intend to issue that number immediately upon receipt of the transfer of the remaining 49% of Turan Enerpetroleum to Turan (…)  It takes 2 or 3 days to have the certificated printed by our transfer agent and delivered to our office.   If you send me the names you want on the certificates, I will order them immediately so there will not be any delays…"

78.     On August 16, 2005, a supplemental agreement was made between Turan and TEP, with the effect that now both jointly guaranteed the payment of $450,000 to KEC, in conformity with Turan's initial letter of guarantee, dated June 1, 2005 (which was subsequently, again, never materialized and which, on information and belief, was not supposed to be materialized).

### (e) Trek Duplicate Certificate Fraud

79.     As admitted in the Trek Complaint as an intervener in the Vanetik action against Turan, on or about June 30, 2005, Trek acquired partial ownership of Turan, by virtue of 9.8 million shares of common stock, memorialized by Certificate No. 249 to Trek on or about July 12, 2005.  See Exhibit B.

80.     However, the Certificate that was given to Bektayev is actually No. 93 (Exhibit B). Evidence shows the existence of the duplicate Certificates, with different numbers, i.e.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

No. 93 and then 249, for the same number of shares, but on the same date, one given to Bektayev, the other later reissued again to Trek, backdated, and used for conversion. (Ref. ¶10 of the Trek Complaint, Exhibit B).

81.     Also, according to Trek's complaint as intervener on or about August 17, 2005, Trek received 14,581,862 shares, which was memorialized by the issuance of the stock certificate No. 250 on or about August 22, 2005.  See Exhibit C.

82.     However, the Certificate that was given to Bektayev is actually No. 95.  Evidence shows the issuance of the duplicate Certificates, with different numbers, i.e. No. 95 and later No. 250, for the same number of shares and on the same date, one given to Bektayev, the other issued to Trek again, backdated, and used for conversion.  (Ref. ¶10 of the Trek Complaint, Exhibit C).   On information and belief, Vanetik and/or Van Duren falsely declared to the Stock Transfer Agent that the Certificates Nos. 93 and 95 (held by Bektayev) were lost and needed to be replaced.

83.     However, in addition to that fraud, the new Certificates, Nos. 249 and 250, issued almost 2 years later, were also backdated, resulting from forgery or some other documentary machination.  All Certificates were identified under CUSIP 89989J 10 6.  These frauds were admitted by FFS in its Memorandum, See Exhibit D.  These acts of "canceling" outstanding stock were used to deprive KEC of its ownership rights in the Concession.

### (e) Essex Managers Ltd., BVI, Fraud

84.     Through the unlawful secondary distribution and other manipulative techniques used by Vanetik and other Defendants, up to 4,745,000 shares in Turan were then

23

transferred to Essex Managers, Ltd. ("Essex"), a BVI company, at the time KEC and Bektayev were defrauded of their stock.   See above. (Later 1 million of these shares were then sold through Essex for $3 million, as admitted by Turan.)

85.     In July of 2005, 3.5 million of Turan stock was transferred from Turan to Essex, under unorthodox circumstances.  On July 6, 2005, Yuri received an e-mail annexing a "draft instruction letter and board resolution regarding the deal with Essex." The "contact information," although indicated his own father's, Vanetik's, cell phone number.

86.     The draft Board Resolution described a transaction in which Essex would purchase up to 10 million shares at $6.00 per share, "payable in combination of cash and the provision of financial consulting services relating to the raising of capital outside of the United States".  Essex, according to that "documentation," was to receive 5 million shares of Turan immediately.

87.     On July 4, 2005, Vanetik directed Van Duren to issue to Essex 11.6 million shares, for the action by the transfer agent.

88.     On July 12, 2005, Turan issued to Essex 3.5 million shares, pursuant to a purported decision on July 11, 2005, signed by Vanetik.  The stock price was ostensibly lowered from $6.00 per share to $1.75 per share, resulting in Essex receiving at least $6,125,000 (for 3.5 million shares). The "combination of cash and financial consulting services" was never explained in the minutes.

89.     Also on July 12, 2005, the instruction letter to the Turan stock transfer agent was sent, which included the same references to Vanetik's cell phone number and required 3.5 million shares be issued to Essex in 6 separate stock certificates.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

90.     From September of 2005 through May of 2008, Essex was given an additional 1,245,000 shares of Turan stock, from Trinh (1,120,000) and two of the phantom "founders", Manley Gray and Franklin Wolfson.

91.     As Plaintiffs' inquiries with the Company Registry in the BVI show, at the time when Essex received millions of shares in Turan, it was eventually suspended or dissolved, for non-paying $1,525 plus $35 penalty, for the overdue payment for the registered agent's services.[2]  Under the laws of the BVI, Essex had no power to transact any business.  Essex was nothing more than a shell entity operated by Yuri and Vanetik over e-mail messages, for directing the fraudulent transfers of Turan proceeds.

### (f) Misrepresentation of Turan's Stock Market Value

92.     All arrangements between Turan and TEP were made upon Turan's misrepresentations to KEC and to the public.  Turan claimed in its Press Releases going back to October of 2005 that its stock was traded in the Over The Counter (OTC) market under the symbol "TURP".

93.     In fact, only about two trades in Turan stock, between insiders, took place, at $12.50 per share.  Those trades were, on information and belief, for only 100 shares each, ostensibly for defrauding the public on the alleged market value of Turan shares.  There was, however, no open market for TURP securities.  These misleading trading transactions were undertaken by Turan's principals only for purposes of stock manipulations and for facilitating fraud.  No public disclosure has been filed, as required by SEC.

---

[2] According to the certificate of the BVI's Registry, Essex was reinstated only on January 1, 2007.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

### (g) Organizational Changes after Kassymov's Death

94.    On January 7, 2006, TEP's Director General Kassymov (a holder of 3 million shares in Turan) died.  In February of 2006, Bektayev traveled to Los Angeles, meeting Vanetik, Squyres, and other Turan's principals.  These parties discussed the plans after Kassymov's death.

95.    Bektayev was made the new President of TEP.  Upon Bektayev's insistence to accelerate works and funding for exploration and for drilling wells, new plans were made toward the next series of necessary works on the Concession.

96.    In March-April of 2006, Turan's CEO Van Duren, accompanied by Turan's employee Striganov, traveled to Kazakhstan where they interviewed candidates for the position of a new Director General of TEP and arranged for setting of a new office in Shymkent (Southern Kazakhstan).

97.    No later than on April 19, 2006, Turan's principals secretly restructured holding of Trek, fraudulently liquidating Bektayev's control over Trek.  The ensuing unauthorized appointments of Trek's new officers included Vanetik as secretary and treasurer, Sergey Lipatov as president and director, and Alexy Stojarov as another director.  See admissions in Exhibit D.

98.    Consistent with the fraud of the duplicate Certificates for the same stock, Bektayev's name was removed from Trek's list of officers. Kushnerenko was appointed the president, director and treasurer, and Asylkhan Brubayev as the secretary of Trek. Vanetik who personally controlled Trek stock, presided over the fraud with invalid stock given to Bektayev.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

99.   On May 25, 2006, KEC filed a complaint in a municipal court in Kazakhstan, claiming that Turan was in breach of contract and demanding $450,000 which was never paid.  By July of 2006, the municipal court in Kazakhstan issued a decision denying that claim.  On October 11, 2006, the appellate court left the lower court's decision without changes.

100.   On June 16, 2006, Turan filed a complaint, Docket No. 06cv3795, against KEC and Bektayev in the U.S. District Court for the Central District of California, essentially alleging breach of contract and a plethora of improprieties.  That complaint was brought in bad faith, because Turan refused to cooperate in discovery and did not intend to bring the case to trial.  That action was dismissed voluntarily on March 27, 2007, after Turan was compelled by the Court to produce all documents relating to the contract with TEP, which documents Turan refused to produce.

101.   On October 12, 2006, KEC filed a complaint in the Inter-regional Commercial Court in Almaty, Kazakhstan, seeking to declare invalid the agreement on the sale of the 49% stake in TEP in March of 2005.  The grounds for relief included the fact that the agreement was not endorsed by the Kazakhstan authorities, as required by Kazakh law.

102.   In January of 2007, Turan and KEC negotiated, unsuccessfully, to novate the initial agreement and to ultimately agree, that Turan had to honor its obligation to wire transfer $450,000 to KEC.

103.   On January 31, 2007, the Inter-regional Commercial Court in Kazakhstan made a decision in favor of KEC, holding invalid the transfer of KEC's 49% stake in TEP.

27

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

104.    On March 7, 2007, the Court of Appeals in Kazakhstan affirmed the decision of the lower court on KEC's suit, invalidating the transfer of KEC's 49% stake in the Concession to TEP.  In April of 2007, TEP was, accordingly, re-registered in Kazakhstan, the 49% stake in TEP being returned to KEC.  Upon that re-registration, KEC also filed in a lower court in Kazakhstan a claim for the remaining 51% stake in TEP, on the basis that KEC had the priority right and provided consideration for that 51% stake.

105.    In about April of 2007, Vanetik brought in Karabaeyv to Turan's management.  On information and belief, Karabaeyv  a person with connections in the underworld in Kazakhstan, was brought in by Vanetik to eliminate Bektayev and to ruin KEC.  On information and belief, Karabayev was to organize racketeering activities in Kazakhstan and in the U.S., with Koichumanov acting on his orders.

### (h) Continued Secondary Distribution of Insider Stock

106.    In parallel to the steps to remove KEC and Bektayev from decision-making at Turan, Defendants engaged the secondary distribution, i.e. not by Turan, but by its insiders which is subject to the mandatory registration requirements of Section 5 of the 1933 Securities Act, where such distribution is treated as a new offering.  This includes distribution by underwriters or controlling shareholders.

107.    None of Cross-Claim Defendants got registered with federal or state agencies in connection with their roles as underwriters and participants in the secondary distribution.

108.    Investments raised by Turan in its own placement, as admitted by Turan, i.e. $2,635,000, constituted only a fraction of the revenues of insiders in the secondary distribution, which, by Turan's purported officers' admission, exceeded $10-15 million.

28

### (j) Frauds with Transfers to Belize Offshore Companies

109.   In early 2007, Vanetik and Karabayev discussed a plan of action, on information and belief, a part of which was eliminating Bektayev, and securing the support of the Kazakh governmental officers and other persons of influence for Turan.

110.   As Vanetik admitted in his complaint in Las Vegas, Karbayev…" represented… that the Concession—by far Turan's most substantial asset—hung in balance unless certain consultants and experts were hired in Kazakhstan.  He would cause the offshore entities with which these consultants and experts were supposedly affiliated to be paid in Turan stock…. Karabayev knowingly and intentionally failed to disclose that he had a financial interest in these entities, and that consultants and experts were never hired".

111.   Among other unlawful transactions, Karabayev persuaded Vanetik to issue one million shares to Okke Financial Ltd., then incorporated *ad hoc* in Belize, on April 26, 2007 and then 3 million shares to Alcina Company Corp., also incorporated in Belize, on May 1, 2007.

112.   In about June of 2007, Karabayev, Turan and Trek reached a three-way agreement. Pursuant to that agreement, Trek was  to transfer its stock to three offshore entities identified by Karabayev, as if those were controlled by the needed consultants and experts.

113.   As admitted in the Trek complaint, Trek "agreed" to transfer 16 million shares of its own shares to entities that Karabayev was to identify.  Karabayev represented to Vanetik and Kushnerenko that these shares would be used to acquire additional concessions in Kazakhstan and to secure the "consultants" and "experts" (on information

29

and belief, meaning that those shares were to be transferred to the "people of influence" in Kazakhstan).

114.   Pursuant to that agreement, as admitted by Trek, in late July of 2007, Karbayev communicated to Kushnerenko the names of three entities to which Trek was to transfer shares of Turan.   Those transfers were to be made to Pington Investment Ltd. (incorporated in Belize), Varrial Financial Ltd. (incorporated in the BVI) and Coast Finance Ltd. (incorporated, on information and belief, in the Bahamas[3]).

115.   That agreement was also a fraud, because it was essentially about redistributing the Turan stock, held by Plaintiffs through Trek, but operating with duplicates of the Certificates, now under Nos. 249 and 250, for the same number of shares, as Certificates 93 and 95 on July 12 and August 22, 2005, given to KEC and Bektayev.  The "duplicate" Certificates were backdated, because the sequential numbers of the Certificates indicated the "duplicates" were issued at least 2 years later.  See Exhibits B-C.

116.   On August 2, 2007, Kushnerenko, acting as Trek's president, admittedly, ratified and accepted the transfers of 5,333,000 shares to each of Pington, Varrial and Coast. Acting as purported secretary/treasurer/director, Van Duren executed these transfers of shares from Trek to Pington, Varrial and Coast, each in care of "Ibar Development LLC".

117.   On information and belief, Van Duren was a person responsible to send these instructions to Empire Stock Transfer, Inc., the transfer agent in Henderson, Nevada, upon Vanetik's instructions to him.  Both knew that that stock belonged to KEC and Bektayev, and yet made some false representations for the transfer agent under oath, because any

---

[3]  Disclaimer: information received upon inquiry on the telephone from the Bahamas registry of companies, subject to confirmation by copies of corporate records.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

alleged loss of an instrument may be certified before the stock transfer agent only under oath.

118.   On or about August 3, 2007, Kushnerenko sent Karabayev a letter confirming that those 15,999,000 shares were transferred to his "associates in Kazakhstan", as directed by Karabayev.[4]

119.   Karabayev caused those transfers of certificates issued to these offshore entities be marked "care of Ibar Development LLC", his real estate entity.  According to Vanetik's complaint, Karabayev promised that he would deliver those certificates to the consultants and experts in Kazakhstan, who were supposedly in control of those offshore entities.

120.   According to Vanetik, Karabayev and Voloshin also offered to contribute $1.3 million in Turan.  Voloshin received one million shares of a "discounted" Turan stock and one million options to purchase more Turan stock at a price of $1 per share.

121.   However, Karabayev, using his newly acquired operative control, then returned $800,000 out of the above purported cash contribution back under his control, without the cancellation of the stock issued for that amount.

### (k) Attempted Murder on July 11, 2007

122.   As cited above, by the spring and summer of 2007, Karabayev and Vanetik engaged in distributing the Trek stock held by KEC and Bektayev, to the "people of influence", per Karabayev's representations to Vanetik.  However, KEC and Bektayev were winning the court decisions in Almaty, Kazakhstan, against Turan, at that time.  At

---

[4] After this action was filed, on September 9, 2008, Trek demanded to return Trek's 15,999,000 shares.  Trek filed its action in intervention, on September 22, 2008, in the Clark County Superior Court, as cited above.

31

the time the Certificates Nos. 93 and 95 were reissued, Bektayev became an extremely undesirable person to Vanetik and Karabayev, who held the original Certificates and had the knowledge of the underlying events as a witness.

123.   On June 29, 2007, the Appellate Court in Almaty, Kazakhstan, made a decision in accordance with which KEC obtained 51% stake in TEP.  On July 11, 2007, that court issued the written decision.

124.   A couple of hours later on that same day, July 11, 2007 a murder attempt was made on Bektayev's life in Almaty, Kazakhstan.  The attempted murder took place in front of the office of KEC, at Dostyk, 33.  Meirmanov was at the office and was a witness.

125.   As Bektayev was coming to his office, an unknown suspect, dressed in a track suit (despite the heat on that day), wearing a baseball cap, ran towards Bektayev from behind. When Bektayev, on the sound of the runner's steps, was turning to the left and backwards to see, the attacker held his head with one hand and stabbed him with a knife in the kidneys area.  The attacker ran away, apparently knowing in advance a short way between neighboring houses.

126.   Bektayev was transported to the hospital, treated in the emergency room and, after several days of a life-threatening condition and internal bleeding, survived.

127.   On the questions of police investigators who arrived at the hospital, Bektayev declared that he suspected certain competitors residing in California, naming Vanetik, Kushnerenko, their associates Kairat Kazhahmetov, as well as Vitaly Zielberberg, TEP's Director General at that time.  The police department in Almaty opened the criminal case, started its investigation, declared search of a suspect using a sketch of the attacker's

DEFENDANTS' ANSWER TO TEP ANS'S COUNTERCLAIM

appearance, made on Bektayev's oral description. However, that search for a suspect (believed not to be a local person) and investigation were not productive to date.

128. As a result of the stab wound, the prolonged treatment at the hospital and after the hospital, Bektayev was under a stress, inactive for several months. During that period of time, Defendants, operating out of the U.S. engaged in damaging the reputation of KEC, made efforts to destroy KEC's business. The ownership of TEP returned under the control of Vanetik and Karabayev. There were two more related court cases initiated in Kazakhstan, concerning the subject matter of TEP's ownership (still on appeal).

<u>(l) Hines Investments, Panama, Frauds</u>

129. The attempted elimination of Bektayev took place right in the middle of transactions when his stock was transferred by Turan's principals to third parties. The circumstances after that murder attempt appear to have heightened Defendants' inclinations to use offshore entities for further fraudulent transfers involving KEC's and Bektayev's interest in Turan.

130. As specified above, in July through August of 2005, Vanetik, caused to transfer of 24,381,862 shares in Turan to Trek, at the time when its authorized capital was 50 million shares. That transfer was, upon admissions, to partially satisfy the obligation to KEC and Bektayev.

131. Those transfers were made in the amount 9.8 million shares on July 12, 2006 (Certificate 93) and 14,581,862 (Certificate 95), for the total of 24,381,862 shares. These Certificates, held by Plaintiffs, state that the authorized capital was 50 million shares, although it was illegally increased three times, all without the approval of the stockholders

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

in violation of the law of Nevada, with an unregistered dilution of the authorized capital, without registration with SEC. See Appendix, B-C.

132.   However, instead of satisfying that obligation to KEC and Bektayev, those shares were misdirected. In addition to the transfers cited above, upon admissions, 8 million of those shares passed through Hines, incorporated in Panama, out of which 2,142,000 shares were retained by Hines. See also FFS's Memorandum, Exhibit C.

133.   As a result of these stock manipulations, Turan's stock was issued in the amount 6,382,000 shares to Private Equity Management and Hines.

134.   In about October 2007, Vanetik caused Trek to transfer 8,382,862 shares to Hines. On or about February 19, 2008, Vanetik caused Hines to transfer 4,240,000 shares to Private Equity, controlled by Defendants. Additionally, on or about March 24, 2008, Vanetik and others caused Hines to transfer 2 million shares to 888 Capital.

135.   In particular, these transactions were admitted in Turan's complaint (at ¶107: "On or about October 2007, Tony Vanetik and others caused Trek to transfer 8,382,862 shares to Hines, upon information and belief. On or about February 19, 2008, Tony Vanetik and others caused Hines to transfer 4,240,000 shares to Private Equity Management, upon information and belief. Additionally, upon information and belief, on or about March 24, 2008, Tony Vanetik and others caused Hines to transfer 2,000,000 shares to 888 Capital (Miller's company)"... These transactions were further admitted by Turan, with a chart on judicial records, at p. 35 of the Turan Complaint.

136.   Private Equity Management, acting through Trinh, sold, on admission, 3,588,333 of the 4,240,000 shares misappropriated from KEC and Bektayev, for about $4,888,333.

34

Trinh shared these proceeds with Vanetik, through an entity controlled by Vanetik, Capital Marketing Systems.

137.   Turan admitted in its complaint..."¶108.   In what amounted to an unregistered secondary distribution of Turan's stock, Private Equity Management almost immediately re-distributed most of its shares (during March and April 2008) to the public, realizing millions of dollars in profits".

138.   Vanetik was personally involved in these transfers.   For example, on or about February 15, 2008, Vanetik directed an instruction letter to Turan's transfer agent to enable to transfer 4,240,000 Turan shares be transferred from Hines to Private Equity Management.

139.   Thereupon, Private Equity Management transferred these shares to 13 investors, for which millions of dollars were received.   As further admitted in Turan's complaint, "¶110. This unregistered secondary distribution by Hiep Trinh, acting through Private Equity Management, was in apparent contravention of state and federal securities registration requirements requiring securities sales agents and public offerings of securities to be registered".

<u>(m) Investigation and Proceedings After First Murder Attempt</u>

140.   Upon the attempted murder of July 11, 2007, Bektayev's health was in grave shape, and KEC's activities were understandably stalled.

141.   As stated above, KEC was under attack by Turan in courts in Kazakhstan.   On September 11, 2007, Turan filed a statement to the Supervisory Judiciary Board of the City Court.   Without a hearing, the Board remanded, without apparent reasons and

35

1 | without notifying KEC, the matter on the transfer of the 49% interest for a new

2 | consideration by the lower court.  (A month later the assistant of the Chairman of that

3 |

4 | Board was charged with bribery in another, unrelated case).

5 | 142.   On December 29, 2007, the lower court made a new decision in favor of Turan,

6 | that regained 49% stake in TEP.  On February 12, 2008, the lower court made decision,

7 | again, in favor of Turan, reversing the allocation of 51% stake to KEC.  The Court of

8 |

9 | Appeals affirmed.  The government's prosecutor, who intervened in that case, supported

10 | KEC's position, but he was overruled. By May of 2008, the Court of Appeals affirmed

11 | another decision, on the reallocation of 49% stake in TEP.

12 |

(o) Further Frauds With Controlling Stock Transferred to Insider Companies

13 |

14 | 143.   In February of 2008, Karabayev engineered a "consulting agreement" with an

15 | entity that Vanetik identified in his complaint against Turan, pending in Las Vegas, as

16 | "Entity X" (believed to be a Kazakh organization named Karlan 111 LLC).  Karabayev

17 | represented that giving stock to Karlan LLC was necessary for preserving the control over

18 | the Concession, and arranged for 35 million shares be transferred to Karlan 111 LLC.

19 |

20 | 144.   However, the "principal" in Karlan 111 LLC happened to be another insider,

21 | Karabayev's elderly mother-in-law Manat Tokbergenova in Kazakhstan.  Tokbergenova

22 | (or rather Karabayev in her place) instructed that 14 million shares were to be issued to

23 |

24 | Karlan 111 LLC, and the remaining 20 million shares be transferred to one of the offshore

25 | entities, which Vanetik identified in his complaint against Turan in Las Vegas as "Entity

26 | Z", and which is believed to be Hines (Panama).

27 |

28 |

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

145.   By these maneuvers, Karabayev, according to the Vanetik complaint, upon the unlawful increase of the stock without shareholders on 3 occasions, Karabayev illegally accumulated control over the Board, never considered or approved by the shareholders.

146.   Utilizing his newly acquired voting leverage, Karabayev arranged for three more directors be appointed to Turan's Board, i.e. Koichumanov, Kenjegaly Kenjebaev ("Kenjebaev") and Aibol Bekmukhambetov ("Bekhmukhambetov"), all without shareholders' election or approval.   None of these new directors of the Board spoke English, could read corporate documents, and were in fact simply Karabayev's nominees.

<u>(p) Fraudulent Transfers Through Pine Brook, Panama</u>

147.   On March 24, 2008, Turan issued 300,000 shares to Pine Brook, a Panama company, controlled by Vanetik and possibly others.   Then on or about April 17, 2008, Pine Brook sold 750,000 of Turan shares, receiving hundreds of thousands of dollars, admittedly not accounted for by Turan to date.

148.   On or about May 9, 2008, Essex transferred 1 million shares to investors Sam Lee (316,667), MJ Capital (525,000) and to Steve Hwang (158,333).   The Agreement between Lee and Essex was in the name "Essex Management, Ltd., a Swiss corporation", instead of disclosing the true name (Essex Managers) and the BVI as the incorporation jurisdiction, with the registered agent Euro American Trust and Management Services Ltd., that collected the local agents' services through First Caribbean International Bank (Cayman) Ltd.

149.   Sam Lee, MJ Capital and Steve Hwang transferred on about February 6, 2008 $1 million, on May 1, 2008 another $1,250,000 and on June 19, 2008 $1,550,000, at $3.80

37

per share, totaling $3.8 million.  On information and belief, these proceeds originated, in part, from SLE Metal, Inc., managed by Sam Lee.

150.    That amount, $3.8 million, was routed to the account of Pine Brook, the Panama corporation, controlled by Vanetik and/or Yuri and possibly others, on information and belief, in Switzerland.

<u>(r) Turan's Internal Takeover by Karabayev Using Offshore *Alter Egos*</u>

151.    By June of 2008, using his offshore *alter egos*, Karabayev completed the internal takeover, becoming Turan's president and replacing Vanetik.  Karabayev also assumed the CEO post.  Voloshin, another of Karabayev's cronies, was named a chief operating officer.  Karabayev also nominated Bisarya, who was his assistant at Ibar Development, as Turan's secretary and treasurer.

152.    As admitted by Vanetik, "Karabayev encouraged a board proposal to "cancel" and "re-issue" directly from Turan the millions of Turan shares" that were originally transferred by Trek to the offshore entities, and to escrow millions of additional shares for Trek.

153.    Karabayev knew that he obtained control over Turan while misappropriating stock belonging to KEC and Bektayev, who represented for him a huge obstacle in his scheme to defraud.  See FFS's opinion on that in Exhibit E.

154.    On August 4, 2008, Vanetik wrote to Bisarya, demanding access to certain documents regarding those fraudulent transfers.  Upon disagreement, Vanetik filed his action on August 20, 2008.  According to the allegations of these two warring internal

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

1  factions within Turan, some documents on the stock transfers were incomplete or missing,

2  or destroyed.

3
   ### (s) FFS's Involvement in Fraudulent Transfers of Turan's Stock
4

5  155.    On information and belief, sometime no later than in April of 2008, Karabayev,

6  who had never been lawfully elected a director of Turan, and whose stock was invalid,

7  involved FFS to consult him.  As a result, FFS became directly involved in planning and

8
   execution of the fraudulent transfers, to further harm Bektayev and Meirmanov.  See
9
10 Exhibits E, F.

11 156.    For example, Exhibit E represents a copy of the FFS's Memorandum, dated July

12 28, 2008 which advised Karabayev what steps to undertake to continue the securities

13
   fraud and to continue the unlawful claim of interest in Turan.
14

15 157.    As another example, Exhibit F represents a copy of a Chart, on information and

16 belief, created by FFS.    The chart, believed to be created by FFS, contains the

17 recommendation, which can be interpreted as to renew "the criminal attacks" against

18
   Bektayev.  See Exhibit F.
19

20          ### (t) Karabayev's Initiating Bektayev's Trip to the U.S.

21 158.    In early June, 2008, Karabayev invited Bektayev to have talks in the U.S. and then

22 consented to Bektay's accompanying Bektayev.  The subject matter was an attempt to

23
   clarify the situation, but, as subsequent events show, planned by Karabayev, in a
24
25 racketeering style, to dissuade Bektayev from defending KEC's interests in the

26 Concession and to give up.

27

28
                                          39

159.   On July 10, 2008, the meeting of Bektayev and Bektay, on the one hand, with Karabayev and Voloshin, on the other hand, took place in the office of Ibar 940 South Coast Drive, Suite 100, Costa Mesa, CA, 92626. which also served as a purported office of Turan.

160.   One of the prime topics of the conversation was the attack on Bektayev in Almaty on July 11, 2007.   Karabayev and Voloshin declared that such matter was handled "unprofessionally".   They said that if it were done "professionally", then Kalashnikov automatic rifles would have been used to guarantee the kill.   Bektayev and Bektay understood this as a veiled threat that next time this would be done "professionally". Karabayev further said that former president of Turan, Vanetik, was no longer in charge and that he would eliminate Vanetik's involvement in that company altogether.  Voloshin commented that the Concession was unimportant by itself, but would allow him to raise $100 million in Russia and elsewhere, and actually finding oil was irrelevant; he did not care if any oil well were drilled at all.

161.   On the next day, July 11, 2008 (which was the anniversary of the knife attack on Bektayev), Karabayev came to the hotel where Bektayev and Bektay stayed (Westin hotel in Costa Mesa, CA), and the second meeting took place.  Towards the end of the meeting, Karabayev took Bektayev aside and offered 15 million of Turan shares, which Bektayev declined, but then discussed $15 million only that Bektayev "go away" from Turan. Karabayev provided no documentary support or guarantees for any monetary offer, believed to be to distract and to defraud again, because there were no such assets to be offered.

40

162.   When Bektayev and Bektay defended in the ensuing conversation KEC's interests, Karabayev ultimately showed anger.   Karabayev, apparently no longer controlling his temper, said to the visitors: "We are sick and tired to make war, to cut (opponents) and to litigate".

163.   In the context of the conversation, observing Karabayev's posture, body language and his face expression, it became immediately clear to Bektayev and Bektay that Karabayev was involved in the murder attempt on Bektayev a year before, on July 11, 2007, and now made little effort to hide it, instead using a menacing tone.   It became clear that Karabayev used that trip not for negotiation purposes, but to gain time and use that time for further frauds with stock and for elimination of Plaintiffs' interest in the Concession by any means.

164.   After that, Bektayev and Bektay resolved to quietly cut short that meeting and their trip to Los Angeles, urgently changing their return air tickets and leaving on the next day. Both were under the impression that they could be followed and that they were possibly unsafe or in some danger.   That feeling of danger was enhanced when Vanetik came to the hotel (Westin) where Bektayev and Bektay stayed, the reason for which visit was unknown.   After that sudden departure, Karabayev, apparently, realized that he said too much and attempted to sidetrack the suspicions, sending several e-mails to Bektayev.

165.   In the e-mail to Bektayev on July 29, 2008, at 09:30:05, Karabayev wrote: "Yerkin, answer! I want to discuss the situation that you were in last year **when you were the subject to the murder attempt.   As I understood, you unequivocally suspect Tony**

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

**(Vanetik), Yuri (Vanetik) and his surrounding people.  I have also suspicions that he was involved in that."** (Highlighting and last names in brackets added).

166.   On August 4, 2008, this action was brought, in part to secure the federal law protection to Plaintiffs, under 18 U.S.C. §§1512 and 1513.  On August 5, 2008, Turan's office was served by server of process Richard Martin, at 3 PM, Robert Kumar accepting service for Karabayev and for the other Defendants.

167.   On that day, August 5, 2008, about 5 and ½ hours after that service on the office, by e-mail stamped the time 20:32:33, Karabayev wrote to Bektayev: **"Yerkin, you idiot are finished!**  I was sure you were duped, that you were Tony's victim, but actually, as it turned out you, yourself, are (obscenity, slang, redacted out).  Tony was right to have had you, as a used (obscenity, slang, redacted out)."  (Highlighting added).

168.   Bektayev and others close to him at KEC realized that by "finishing" Bektayev, Karabayev had in view the conversation with him and Bektay about the "unfinished" murder attempt on July 11, 2007.  Bektayev, his family and others close to him, came to the conclusion that Bektayev's life was in mortal danger.

<u>(u) Murder Attempt on October 31, 2008</u>

169.   Bektayev then spent certain time while traveling on business, trying to stay in Almaty, Kazakhstan, as little as possible and accomplish most of work by telephone and e-mails.  Bektayev's family sent children for safety out of the country.  Bektayev, fully aware of the mortal danger to his life, came to KEC office on very seldom occasions.  The reasons for that fear were also that Karabayev, on information and belief, came to Kazakhstan and, on information and belief, rumors were circulating that Karabayev had a

42

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

short temper, prone to outbursts of rage, and thus Bektayev's life was in immediate danger.

170.    One of those few occasions when Bektayev was to visit KEC's office by necessity, was to take place on October 31, 2008.  At about 10:40 A.M. on that day, when Bektayev was coming to the KEC office and was leaving the car on the intersection of Chaikovsky Street in Almaty, an unidentified person, awaiting him approached him, pulled the gun and, in an execution style, made at least 5 shots at Bektayev, from a firearm believed to be with a silencer.

171.    Three bullets penetrated Bektayev's chest, one bullet missing the heart by a couple of inches and stuck in the lung.  Two more bullets became lodged, fractured in the chest. One bullet passed the through the victim's right arm.

172.    On information and belief, at least one of the shots was on the lying victim, aimed at the back of his head, in an execution style.  The bullet was, however, slightly off target, did not penetrate the skull bone and became fractured, causing the brain contusion.  The assassin immediately disappeared.   The police alert and the distributed sketch of the attacker did not help find the assassin, with all indications that the crime was thoroughly and professionally preplanned, including the escape route, the firearm with a silencer and other means of the hired assassin.

173.    Bektayev was brought to the hospital, put on life-sustaining equipment, and underwent several most complicated surgeries, first to stop the internal bleeding, later several surgeries to extract the bullets and fractions from the chest and the skull.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

174.   The authorities in Kazakhstan posted two armed guards from the special army assault unit, by the hospital's room where Bektayev was treated, to protect the victim against further attacks on his life.

175.   When Bektayev was conscious, but under the belief of his impending death, he was questioned by police investigators, whom he suspected videotaped what he said. Bektayev said he suspected Karabayev, Vanetik and others, of Turan, to be responsible for what was done to him.

176.   On information and belief, Karabayev, who was in Kazakhstan shortly before the murder attempt, made himself unavailable to the Kazakh law enforcement that was seeking to question him.   Karabayev's whereabouts, who since (or before the murder attempt) possibly left or absconded from Kazakhstan, appear to be unknown to the investigative authorities.

<u>(v) Fraudulent Transfers to APOG, Seychelles Islands</u>

177.   After this action was filed on August 4, 2008, Karabayev intensified his efforts to fraudulently transfer a part or all of Turan's purported interest, held through TEP, to APOG, a shell entity incorporated in Seychelles, on information and belief, Karabayev's alter ego.   Overcoming the lack of authority, lack of approval by shareholders, and without advising shareholders, Karabayev undertook further unlawful activities.

178.   Shortly after this action was commenced, on information and belief, Karabayev, Dzhakishev and Adilzhan, undertook an unlawful transaction on the transfer of 20% interest in the Arys concession, that was to be transferred to APOG, for the alleged price of $5 million.

44

179.   Karabayev used the account in the name of Turan, at Wells Fargo bank in California, to wire transfer the proceeds.  As of the time of the Notice of Special Meeting, February 5, 2009 (see below), there was a $4 million balance on Turan's account at Wells Fargo bank. See Exhibit G.

180.   After the Notice was published, Karabayev immediately started to liquidate that account, wiring out altogether $2.5 million.  In the latest instance, Karabayev attempted to wire transfer $490,000 out of that Turan account, on information and belief, as a part of the unlawful transfers, to show as if $5 million was "paid" for the 20% transfer to APOG, on March 4, 2009.  That attempted wire transfer was blocked by Wells Fargo, per request of the newly elected directors.  The remaining balance of the proceeds left on Turan's accounts at Wells Fargo was only the last $1.5 million (out of about $15 million, on information and belief).  In the Counterclaim, filed by FFS on March 9, 2009, the $4 million balance as of February 5, 2009 was concealed, essentially all purported facts and numbers were misrepresented, in a shameful purported budget, a sham constructed by Karabayev and FFS, and not supported by any legitimate invoices.

### (w) Shareholders Special Meeting Convened and Resolutions Adopted

181.   Due to the exigent circumstances cited above and the last $4 million being in jeopardy of dissipation, on February 5, 2009, the Committee of the majority shareholders, upon consultations duly conducted, convened a Special Meeting of Shareholders.  The Meeting was convened under the circumstances when there were no directors lawfully elected pursuant to Nevada statute NRS 78.330, and pursuant to shareholders' residual and plenary rights to convene meetings, under NRS 78.530 and other law.

45

182.    The notices of the Special Meeting were mailed to over 120 known addresses of shareholders and their representatives and published through an information agency on the Internet.  The Meeting was convened by the majority Shareholders of the Corporation at the law offices Macleod Dixon, at: Manasa Street, 32A, 3rd Floor, Almaty, 050008, Kazakhstan, on February 19, 2009.    It should be noted that while the majority of the number of shareholders may reside in California. the holders of the majority of shares outstanding as of August 30, 2005, (the "Majority shareholders") were residents in Kazakhstan, as were Turan's purported former directors.  If these purported directors were indeed lawful shareholders, they would have attended and submitted their certificates or proxies.

183.    At the Special Meeting, 30,117,032 shares were voted, out of a possible 50 million, which represented 60.23% of the authorized capital and constituted a quorum.  See Exhibits A-C with the authorized capital of 50 million, within the four corners of the documents.  Under the Nevada statutes NRS 78.207, 78,209 and other law, authorized capital may not be increased without the approval of the shareholders, whose interests would have been effected, such "increases" were void as to the holders of these stock certificates and rights.

184.    Out of all shareholders present or by proxy, 27,017,032 (89.7%) were voted "For", and 3,100,000 (10.3%) were voted "Against" the election of the interim Board of Directors.  Karabayev and 3 more Kazakh individuals who held themselves out as Turan's directors, could appear, but would have been obligated to submit for inspection their stock certificates (in the nominees in Belize, the BVI, Panama, etc.), which they avoided to do.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

185.    At the Special Meeting of Stockholders, Yerkin Akkuzov, Yerkin Bektayev, Kanet Meirmanov, Sabirgan Dushaliev and Igor Maximov were elected the interim directors. The Directors then elected Yerkin Akkuzov to be the Chairman of the interim Board and its acting Chief Operating Officer, Sabirgan Dushaliev to be the corporate Secretary and Igor Maximov to be Treasurer.

186.    Out of all shareholders present or by proxy, 27,017,032 (89.7%) were voted "For", and 3,100,000 (10.3%) were voted "Against" the proposed 12 Resolutions, including removal from any and all positions of the individuals who had held themselves out as Turan's directors, without being elected by shareholders (§§1-3), liquidation of Turan and creation of a court-appointed receivership for restitution to bona fide shareholders (§4-5); annulment of all fraudulent transfers between the insiders and Cross-Defendants in Seychelles, BVI, Panama, Belize and Bahamas (§6); the restitution of the rights under the Arys concession back to Kazenercom TOO (§7); voidance of the offshore transfers concerning the rights under the Arys concession (§8); and other decisions.

187.    Following the election of the new Board, it convened the meeting of the Board, that adopted the By-Laws of Turan (pending liquidation) and made decisions upon the implementation of the Resolutions by the Board.

188.    On March 2, 2009, the new Board directed a letter to FFS, immediately firing that firm and prohibiting its purported representation of Turan.  The Board required from FFS to return all the fees obtained from Turan through Karabayev who had no authority to manage Turan's assets either to Turan or to deposit into the court.  The Board also required to transfer all documents received in connection with the purported

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

representation of Turan to the attorneys in Ottawa, Canada, designated for that. See Exhibit E.

189. On March 9, 2009, FFS, purportedly acting for Turan, but in fact, having no authority for that, filed a Counterclaim and Third Party Complaint, naming Bektayev and Meirmanov as the defendants. The document was a rambling recycling of the same unsupported allegations, without any factual support.

190. The annexed table, created by FFS, without pretense to comply with any accounting standards, purportedly to show expenditures in fact revealed that FFS was one of the main claimants, that there were repeated entries. Making a material omission before the Court, FFS concealed that in fact, the balance of the $1.5 million was only the leftover. In fact, FFS concealed the fact that about $2.5 million was already missing, as compared to the balance of $4 million 4 weeks earlier, and where the $2.5 million was hastily wire transferred, for what purpose and who was the beneficiary. See Exhibit G.

## COUNT 1.   VIOLATION OF SECURITIES LAW

191. Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-189 above.

192. By virtue of admissions by Trek, there were two sets of the same Certificates of Turan's shares issued to Trek. In particular, Turan's 9.8 million shares of common stock, were memorialized, first by Certificate No. 93, of July 12, 2005, showing CUSIP 89989J 10 6. However, Trek then admitted that there was also Certificate No. 249 to Trek, with the identical number of shares and on the same date, possibly backdated. (Ref. ¶10 of the Trek Complaint). See Exhibits B, C.

48

193.   Likewise, Turan's 14,581,862 shares issued to Trek on August 17, 2005, was memorialized by one Certificate, No. 95 given to Bektayev, also showing CUSIP 89989J 10 6. However, Trek then admitted that there was also Certificate No. 250 to Trek, with the identical number of shares, issued on the same date or backdated.

194.   There is appearance that Turan operators fraudulently "canceled" the two Certificates given to Bektayev, Nos. 93 and 95 or declared those be "lost" before the stock transfer agent, and then caused two new Certificates, for the same numbers and showing the same date, or backdated, be issued under Nos. 249, 250.  On information and belief, the stock transfer agent is Empire Stock Transfer, Inc., with offices at: 2470 St. Rose Pkway, Suite 304, Henderson, NV 89074.

195.   In fact Defendants operated after July of 2005, as if Bektayev's Certificates holding Turan's stock did not exist or did not matter.  If proven and subject to the inspection of the second set of the Certificates, there is appearance of the instruments' fabrication and/or forgery, and/or false statement under oath to the stock transfer agent, on information and belief, Empire Stock Transfer, Inc., located in Henderson, Nevada.

196.   Defendants violated S.E.C. Rule 144 together with 15 U.S.C. §§ 78j, 78t, 78i, 77l, 77o, 78k and 78t-1 by engaging in the prohibited activities with respect to the publicly traded securities, including but not limited to:

   a.   Suggesting to sell or transfer in brokered or non-brokered transactions, common stock that was restricted without lawfully complying with the Rules and Regulations of the S.E.C. and particularly with S.E.C. Rule 144.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

b. In particular, Defendants' failing in the removal of such restrictive stock trading legends when the company was not then, nor has ever been, current in its filing requirements, which has been deliberate in its violation or avoidance of the securities requirements under SEC Rules, in order to continue stock manipulations.

c. Defendants' making misrepresentations to Bektayev about holding Turan through Trek and selling void securities to Bektayev and KEC, manipulating the market price of Turan common stock trading as restricted securities, other manipulative schemes and devices.

d. Defendants' trading in securities while in possession of material non-public information, and acting as insiders.

e. Trading in securities in violation of the S.E.C. Filing Requirements and when there was no public information available.

f. These violations were occurring when several officers, directors or employees in Turan and/or Trek, in particular Vanetik, Squyres and Jim Fuller, had previous small and/or public company experience which leaves no excuse for such deliberate and continuous violation of securities regulations and requirements.

g. In a representative example, Defendants traded, as between insiders, certain stock named TURP, at $12.50 per share.   However, on information and belief, there were only a couple of trade transactions involving nominal amounts of 100 shares.   Then they took steps to have such untrue price be

50

reflected on Zacks Analytical website, Yahoo Financial, and other sources of information for investors, as though it were a market price.

197.    In another example, Vanetick, in an e-mail to Bektayev on April 14, 2005, referred Bektayev to the sources showing that price at $12.50 a share, which later would be interpreted to be applicable to the value of the stock of 24,381,862 shares in Turan that was supposedly given to Bektayev and KEC.

198.    Since the beginning of marketing Turan's stocks, on information and belief, its principals did not arrange for a single general meeting of shareholders, or, at a very minimum, never advised Bektayev or KEC of it.  Vanetik, using the fact that the Board consisted only of himself and Van Duren, essentially ran Turan as his personal venture, unaccountable to anyone.

199.    Defendants further engaged in conduct that is prohibited pursuant to §10(b) and 20(a) of the Securities Exchange Act [15 U.S.C. §78j(b) and 78t(a)] and Rule 10b-5 promulgated by the S.E.C. [17 C.F.R. §240.10b-5] and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §77z-1.

200.    Defendants' conduct further invokes causes of action under 15 U.S.C. §78i (Manipulation of security prices), 15 U.S.C. §78j (Manipulative and deceptive devices), 15 U.S.C. §78t (Liability of controlling persons and persons who aid and abet violations), 15 U.S.C. §77I, (Civil liabilities arising in connection with prospectuses and communications), 15 U.S.C §78k (Trading by members of exchanges, brokers and dealers), 15 U.S.C §78j-1 (Audit requirements), 15 U.S.C §78m (Periodical and other reports), 15 U.S.C. §78p (Directors, officers, and principal shareholders), 15 U.S.C. §78r

1    (Liability for misleading statements), 15 U.S.C. §78t-1 (Liability to contemporaneous

2    traders for insider trading), and S.E.C. Rule 144.

3
4    201.   Due to the foregoing violations of the applicable law, S.E.C. rules and regulations,

5    Defendants are liable for statutory damages, other damages, including consequential

6    damages, suffered by Third Party Plaintiffs.

7    202.   Third Party Plaintiffs are entitled to relief on this Count.

8                              **COUNT 2.  CONVERSION**
9
10   203.   Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-201

11   above.

12   204.   As stated above, Vanetik and other Defendants sold Trek's stock to Bektayev for

13   his full ownership and for controlling the stock in Turan.

14
15   205.   Vanetik proposed that Bektayev himself signed Trek stock Certificate for 100,000

16   shares, twice, as a president and secretary of Trek and he gave to Bektayev Turan's

17   corporate stamp.  However, Vanetik and other Defendants knew that Bektayev, as an

18   alien, had no right to be a shareholder in a corporation created under IRS 1244 and that

19   such a Certificate was nil and void.
20
21   206.   Defendants also concealed the fact that Trek's authorized capital was 75,000,000

22   shares and that these shares could be issued at any time by Trek's incorporator.  Vanetik

23   told Bektayev that Bektayev had the power to issue any number of shares in Trek himself,

24   which was also untrue.
25
26   207.   As a result, Venetik and other Defendants converted Bektayev's and KEC's assets,

27   represented by void stock, and his title to those assets, by using fraud.

28

208.    Then Third Party Plaintiffs' interest in Turan's stock was converted by Defendants using Essex, incorporated in the BVI, 3 entities incorporated in Belize (Okke, Alcina and Pington, see above), 2 entities incorporated in Panama (Hines and Pine Brook, see above), among other offshore entities.  As admitted by Turan, more than $5.8 million was diverted to Essex's, Hines' and Pine Brook's accounts in Switzerland.

209.    Among other things, having received value from KEC, Turan was obligated to transfer $450,000 to KEC.  Turan, under various pretexts, failed to do so.  As a result, Turan converted KEC's and other Third Party Plaintiffs' assets.

210.    Among other things, FFS got involved with Karabayev acting without being elected by Turan's shareholders and claimed fees from Turan's assets, without lawful right to do so.  FFS should be ordered to return of such fees either to Turan or to deposit those with this Court.

211.    Third Party Plaintiffs are entitled to relief on this Count.

**COUNT 3.  BREACH OF CONTRACT**

212.    Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-210 above.

213.    On approximately 3 occasions, including in April of 2005 and others, Defendants concluded Agreements with KEC and Bektayev, in the name of Turan, but each time breached all of those Agreements.

214.    In a particular example, Defendants breached the contract with KEC and Bektayev, when they first gave to Bektayev two Certificates, Nos. 93 and 95, for 9.8 million and 14,581,862 shares, as consideration for the interest in the Concession (which were sent by

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

certified mail from the U.S. to KEC and Bektayev in Kazakhstan).   Then, as it appears, Defendants "canceled" the outstanding shares, in breach of contract.

215.   As a result of Turan's and other Defendants' systematic breaching all attempted contracts, Defendants were injured.

216.   Therefore, all agreements involving Defendants should be held void or voidable, and Third Party Plaintiffs obtain restitution of their rights to, and control, over the Concession.

217.   Third Party Plaintiffs are entitled to relief on this Count.

## COUNT 4.   FRAUD AND MISREPRESENTATION

218.   Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-216 above.

219.   At all relevant times, certain Defendants planned to defraud Third Party Plaintiffs, by means of making false misrepresentations, essentially in the entire course of contacts with Third Party Plaintiffs.

220.   In a representative example, Vanetik gave to Bektayev a Certificate (for 100,000 shares) in Trek, with the false proposition that this represented all of Trek's stock and that it guaranteed to hold 24,381,862 shares in Turan, whoever held Trek's stock.   Vanetik also misrepresented as if Bektayev could issue himself any number of shares in Trek, up to its authorized capital of 75,000,000 shares, and giving to Bektayev Trek's corporate stamp which was supposed to constitute title delivery, but which stamp controlled nothing and could be replaced.

54

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

221.   However, in the real life, Bektayev, as an alien, had no right to hold stock in Trek, by virtue of its registered status of a small business company, in which only residents could hold stock.  As a result, instead of 100% control, Bektayev was defrauded to hold actually 0% control in Trek and consequently in the stock that those represented in Turan. Vanetik used Bektayev's lack of experience and abused trust.

222.   By way of promoting their frauds, Defendants used at least 3 offshore entities in Belize, 2 entities in the BVI, 2 entities in Panama, with, on information and belief, accounts in Switzerland, to transfer out the proceeds to their own accounts, in a Ponzi scheme.   Defendants never had any intentions to fulfill their obligations before Third Party Plaintiffs or the obligations under the Concession, or to drill any out of the 4 mandatory oil wells.

223.   The surge of the fraudulent transfers to offshore entities in Belize, the BVI Panama occurred when Karabayev joined Turan and subsequently made the efforts to eliminate Vanetik's managerial control.

224.   Karabayev was the mastermind of the sophisticated frauds, to use the offshore shell entities in Belize and the BVI, as if to benefit certain "people of influence" in Kazakhstan, at the time when he actually used those to increase his control over the stock, by purportedly amassing 46 million shares with, admittedly, 41% of the voting power, at the expense of Bektayev.

225.   Defendants essentially elected the pattern and complicated offshore schemes, including duplicate Certificates, for defrauding Third Party Plaintiffs at all significant

55

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

junctures, with the overall scale of such fraudulent activities translating in damages for $304,773,275, as shown elsewhere.

226.   In order to achieve their objectives, Defendants engaged in systematic misrepresentation of facts, as well as concealment of material facts.   That included the misrepresentations about the value of stock in Turan, issue of securities, control by Trek of Turan, and systematically in other instances.

227.   Third Party Plaintiffs are entitled to relief on this count.

### COUNT 5.   UNJUST ENRICHMENT

228.   Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-226 above.

229.   Using fraud and misrepresentations, in combination with the violations of the securities statutes, cited above, Defendants were unjustly enriched, at the expense of Third Party Plaintiffs.

230.   For example, the purported transfer of Trek's stock, ostensibly translating to $304,773,275 value, was fraudulently made void.   Defendants' using the "duplicate" Certificates, of the same dates and with the same numbers of shares, unjustly enriched these Defendants.

231.   Defendants collected substantial assets from investors in the U.S., exploiting the Concession project, without the intention to materialize the exploration of oil, all this at the expense of Third Party Plaintiffs who were unlawfully removed from their fair share and role in the Concession.   While using investors' proceeds, Defendants inflated the

56

prices of actual outlays in Kazakhstan, routing certain cash flow for their immediate enrichment.

232.    Instead of fulfilling any obligations before Third Party Plaintiffs and under the Concession, Defendants diverted over $10-15 million of proceeds, using one entity in Seychelles Islands, 3 entities in Belize, 2 entities in Panama and 2 entities in the BVI.

233.    Third Party Plaintiffs are entitled to relief on this Count.

## COUNT 6.   CIVIL CONSPIRACY

234.    Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 232 above.

235.    At all relevant times, Defendants, and all of them, formed a civil conspiracy used against Third Party Plaintiffs for depriving them of lawful consideration.

236.    As a particular example, in June of 2007, Karabayev, Vanetik and Trek arranged in a three-party arrangement for 16 million shares in Turan to be transferred from Trek to at least three offshore entities, purportedly for achieving their goals in Kazakhstan by illegal means.

237.    The civil conspiracy described in this action was particularly sophisticated in terms of money laundering using frauds on Third Party Plaintiffs and using offshore accounts.

238.    Third Party Plaintiffs are entitled to relief on this Count.

## COUNT 7   FRAUDULENT CONVEYANCES

239.    Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-237 above.

240.    Defendants engaged in an unauthorized issuance of stock, marketing securities and other conduct, without disclosure to Third Party Plaintiffs who were entitled to that

57

information.   Third Party Plaintiffs believe that Defendants used duplicate accounting methods: one for showing to investors, the other for real accounting.  Defendants engaged in fraudulent conveyances.

241.   Among fraudulent transfers, the holdings rights belonging to Third Party Plaintiffs, memorialized by Certificates Nos. 93 and 95, were "canceled", and, instead, those holdings rights were fraudulently transferred to offshore entities under Defendants' control.  These "cancellations" and fraudulent transfers should be undone.

242.   In particular, on information and belief, Karabayev caused commingling of assets and caused Turan's assets be siphoned into Ibar and Ibar Ventures under his full control.

243.   In a particularly egregious manner, Defendants engaged in fraudulently transferring assets to APOG (Seychelles Islands), Varrial and Essex (both incorporated in the BVI), Hines and Pine Brook (both in Panama); Pington, Okke and Alcina (all three in Belize).  These fraudulent transfers were designed to effectuate the Ponzi scheme and make over $10-15 million, admittedly amassed through misrepresentations, out of reach of Third Party Plaintiffs and other claimants.

244.   Third Party Plaintiffs are entitled to relief on this Count, namely fraudulent conveyances should be undone, under the applicable law, and full accounting for those fraudulent transfers ordered.

## COUNT 8.   ACCOUNTING

245.   Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-23 above.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

246.    On numerous occasions, KEC and Bektayev made requests to Turan and Trek to account for their shareholding rights, being entitled to those rights under Certificates Nos. 83, 93 and 95, that represented the controlling holdings in both Turan and Trek.

247.    Vanetik, Karabaev, Turan refused to account for any of the questions concerning the cash flow and other most important managerial decisions.  As a result of denying access to accounting, Defendants were able to confiscate KEC's interest and control, to set up a Ponzi scheme, siphoning the proceeds to the offshore accounts.

248.    Third Party Plaintiffs are entitled to relief under this Count.

## COUNT 9.   DECLARATORY RELIEF

249.    Third Party Plaintiffs re-allege all of the allegations contained in paragraphs 1-247 above.

250.    Based on the above cited facts, the acquisition by Turan of control over TEP should be declared void and nil, as premised on fraudulent conduct of Defendants.

251.    More specifically, at no time did the parties reach a 'meeting of the minds', whereas Turan's principals acted at all times with the inherent intent to defraud and not to comply with any contractual terms, systematically acting fraudulently and in bad faith.

252.    Consequently, given the pervasive fraud committed by Turan and its principals in entering into the agreements with KEC and Bektayev, all such attempted agreements should be declared nil and void, and KEC should be declared the sole lawful title holder of the rights to the Concession.  Vanetik, Karabayev, Voloshin, Koichumanov should be declared unfit for transactions with securities in the U.S. within the jurisdiction of SEC, and, upon the Court's conclusion, their conduct should be referred to SEC.

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

253.   As cited above, based on Trek's admissions, Certificates Nos. 249 and 250 of Turan, for over 40% of interest to be held by Trek, were reissued instead of Certificates Nos. 93 and 95, for the same amount, held by Third Party Plaintiffs.

254.   Third Party Plaintiffs are entitled to the declaration that the "cancellation" of the outstanding Certificates was nil and void, and reinstate the rights under the original stock Certificates held by Third Party Plaintiffs to this date.  Among other remedies, Third Party Plaintiffs are entitled to a new general meeting of shareholders to set up management for liquidation and/or reformation of the venture on equitable and transparent basis to satisfy investors' prorated interest in whatever is recovered, with all due filings at SEC to be accomplished.

255.   Third Party Plaintiffs are further entitled to annul the fraudulent transfer of 20% interest in TEP to APOG, by way of a declaratory relief.

256.   Third Party Plaintiffs are entitled to relief on this Count.

//

        WHEREFORE, Plaintiffs in the present Third Party Complaint pray for the following relief:

        (a) - damages, with inclusion into those damages or citation of separate damages for private action for Defendants' securities law violations;

        (b) – to declare void the fraudulent transfers from Turan to APOG (Seychelles Islands), hold nil any attempted dissipation of the rights under the Concession and to return the missing $2.5 million back to the account in the name of Turan at Wells Fargo Bank, with maintaining freeze;

60

(c) - to declare void the second set of the Certificates of Turan stock, given first KEC and Bektayev, under Nos. 93 and 95, for 9.8 million and 14,581,862 shares respectively, which were apparently then substituted by the illegal "duplicate" Certificates Nos. 249 and 250, for the same numbers of shares and on the same dates, or backdated, also of July 12 and August 22, 2005 [Exhibits B-C];

(d) -  the orders to the effect of the illegal substitution of the stock Certificates, obligating to validate the original Certificates under Bektayev's control;

(e) – to grant declaratory relief, such as declaring the agreements between Turan and TEP void, and other appropriate declaratory relief, including concerning the rights in the Concession;

(f) – to order FFS to transfer all documents belonging to Turan to the Interim Board, to return to Turan all fees unlawfully paid from Turan's assets upon direction of unauthorized individuals, never elected directors by the shareholders, and to cease and desist holding out as Turan's attorneys;

(g) – to aware the inclusion into the above damages or separate punitive and further other damages for the improper conduct, as the Court finds just;

(h) - injunctive relief, seeking an Order to make the temporary freeze of $1.5 million at Wells Fargo permanent until the account is transferred under the control of a court-appointed receiver;

(i) injunctive relief, seeking to enjoin Cross-Defendants, to seize and desist from using Turan stock for purposes of marketing questioned securities, misrepresenting their control in any foreign concerns;

61

(j) - in particular, to declare that the offshore entities set up by Defendants had no separate corporate existence and were their alter egos, to wit, Essex (BVI), Hines and Pine Brook (both Panama) being all *alter egos* of Vanetik, on the one hand; and APOG (Seychelles), Varrial (BVI), Pington, Okke, and Alcina (all three incorporated in Belize) being *alter egos* of Karabayev, on the other hand;

(k) - to order all above cited offshore entities to return the proceeds sent to the accounts in the name of their *alter egos*, including set up in Switzerland, to the U.S. jurisdiction and into the receivership under the Federal Rule of Civil Procedure 66;

(l) - in the light of the Ponzi scheme, perpetuated in the name of Turan, to order a receivership and to appoint a federal receiver for Turan, pursuant to Rule 66;

(m) - attorneys' fees and costs;

(n) - such other and further relief as the Court may find just and proper.

Dated: March 16, 2009

APPENDIX: Exhibits A-G.

Respectfully submitted:

/s/

CEDRIC JOSEPH SEVERINO, Esq.
Law Offices of Cedric Severino

Counsel:
GEORGE LAMBERT, Esq.
Law Offices Lambert and Associates
District of Columbia bar #979327
Law Offices
1025 Connecticut Ave., Suite 1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897; Fax (202) 857 9799
Attorneys for Plaintiffs
E-mail:

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

1

# DEMAND OF JURY TRIAL

2

3

Plaintiffs demand jury trial.

4

Dated: March 15, 2008

5

Respectfully submitted:

6

7

/s/

8

CEDRIC JOSEPH SEVERINO, Esq.
Law Offices of Cedric Severino

9

10

Counsel:
GEORGE LAMBERT, Esq.

11

Law Offices Lambert and Associates
District of Columbia bar #979327

12

Law Offices
1025 Connecticut Ave., Suite 1000 NW

13

Washington, D.C., 20036
Tel. (202) 640 1897; Fax (202) 857 9799

14

Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

63

DEFENDANTS' ANSWER TO TURAN'S COUNTERCLAIM

1

## **VERIFICATION OF COMPLAINT**

2

3     I, Kanet Meirmanov, state and depose under the penalty of perjury that I have read

4  the foregoing Third Party Complaint and know the contents therefore.  The same is true of

5  my own knowledge, except as to those matters which are therein alleged on information

6

7  and belief, and as to those matters, I believe it to be true.

8     I declare under penalty of perjury that the foregoing is true and correct.

9

10

11  Dated: March 15, 2009

12                                                /s/_____
                                              Kanet Meirmanov
13

14                                              (annexed)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' ANSWER TO THIRD PARTY COUNTERCLAIM

**APPENDIX**

**KAZENERCOM TOO, et al.**

**v.**

**TURAN PETROLEUM INC., et al.**

# EXHIBIT  A

**Title for Exhibit:**

**Certificate of Stock No. 83 in Turan Petroleum, Inc.**

**Original Set Held by Plaintiffs**

Account Summary



**Basic Banking®**

Welcome ROBIN BISARYA
Role: Administrator/User

Main Menu

Account Summary

Transfer Funds

**Account Summary**

Active Group ▣
DEFAULT ⌄

To view an account's transaction history, please click on the account's available balance or outstanding balance.

▣ For more information

Printer Friendly Version

Try the CEO Mobile℠ service! Send the CEO Mobile link to your mobile device in a text message, an email, or both.

Note: Data charges by your mobile carrier may apply.

☐ Send to my mobile phone

☐ Send to my profile email

[ Submit ]

**Cash Accounts**

| Account Number | Account Name | Beginning Day Balance | Available Balance ▣ |
|---|---|---|---|
| 313-8162700 § | Basic Business Checking | $12.00 | $12.00 |
| 265-3846101 § | Business Checking | $501,243.63 | $6,243.63 |
| 573-8215283 § | Business Checking | $4,004,792.58 | $3,999,792.58 |
| | Totals | $4,506,048.21 | $4,006,048.21 |

§ BUS808: Balance displayed may not reflect transactions completed today.

Contact Us  | Help
© 2002 - 2007 Wells Fargo. All rights reserved.

As of February 5, 2009, next day after the Notice of Shareholders' Meeting convened for February 19, 2009

SHARES

**2,618,138**

COMMON STOCK

CUSIP 00000 00 0

03

COMMON STOCK

# TURAN PETROLEUM, INC.

THIS CERTIFIES THAT

***YERKIN BEKTAYEV***

is the owner of

**TWO MILLION SIX HUNDRED EIGHTEEN THOUSAND ONE HUNDRED THIRTY EIGHT**

TURAN PETROLEUM, INC.

# APPENDIX

## KAZENERCOM TOO, et al.

### v.

## TURAN PETROLEUM INC., et al.

# EXHIBIT  B

### Title for Exhibit:

**Certificate of Stock No. 93 in Turan Petroleum, Inc.**

**Original Set Held by Plaintiffs**



NUMBER
93

SHARES
**9,800,000**

COMMON STOCK
CUSIP 89989. 103

TURAN PETROLEUM, INC.

THIS CERTIFIES THAT

***TREK RESOURCES, INC.***

is the Owner of

***NINE MILLION EIGHT HUNDRED THOUSAND***

TURAN PETROLEUM, INC.





# APPENDIX

**KAZENERCOM TOO, et al.**

**v.**

**TURAN PETROLEUM INC., et al.**

# EXHIBIT  C

### Title for Exhibit:

**Certificate of Stock No. 95 in Turan Petroleum, Inc.**

**Original Set Held by Plaintiffs**







# EXHIBIT  D



# Memorandum

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

**To:**  Turan Petroleum, Inc.  ("Turan" or the "Company")

**FROM:**  Sylvia M. Scott

**DATE:**  July 29, 2008

**SUBJECT:**  Analysis of Information Gathered During Turan's Internal Audit; Due Diligence for a Revised Private Placement Memorandum; Problems and Proposed Solutions

This memorandum provides an analysis of factual findings resulting from an internal audit performed by Turan's Secretary/Treasurer, Robin Bisarya. This memorandum also serves as due diligence for needed revisions to Turan's private placement memorandum ("PPM") and anticipated capital raise.

The purpose of this memorandum, outlined in the table of contents below, is to simultaneously identify problems and solutions so that the Company can move forward in a positive direction and decisively address the issues described herein. At the end of each section of this memorandum there is a summary that includes: 1) a concise statement of the problem; (2) why the problem is significant; and (3) proposed solutions to the problem.

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

| TABLE OF CONTENTS | |
|---|---|
| I.     Background of the Company | 3 |
| II.     Issue:  Whether Certain Stock Transfers Relating to Trek Resources, the Bektayev Group, Karlan 111 and Pine Brook Were Authorized/Legal | 4 |
| A.     Facts Relevant to the Issue | 4 |
| B.     Problems and Solutions | 9 |
| 1.     Concise Statement of the Problem | 9 |
| 2.     Why the Problem is Significant | 9 |
| 3.     Action Items and Proposed Solutions | 11 |
| III.     Issue:  Adequacy of Disclosure to Investors; Questionable Uses of Turan's Funds | 12 |
| A.     Facts Relevant to the Issue | 12 |
| B.     Problems and Solutions | 14 |
| 1.     Concise Statement of the Problem | 14 |
| 2.     Why the Problem is Significant | 14 |
| 3.     Action Items and Proposed Solutions | 14 |
| IV.     Issue:  Commingling; Internal Controls and Recordkeeping | 15 |
| A.     Facts Relevant to the Issue | 15 |
| B.     Problems and Solutions | 16 |
| 1.     Concise Statement of the Problem | 16 |
| 2.     Why the Problem is Significant | 16 |
| 3.     Action Items and Proposed Solutions | 16 |

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

## I.   Background of the Company

Turan was incorporated in Nevada in March 2001 under the name, Elite Registry, Inc. ("Elite") and is currently based in Costa Mesa, California. Elite's name was changed to Turan in December 2004 and, in January 2005, the Company's Articles were amended to designate as its "initial directors" Tony Vanetik and Robert Van Duren. The January 2005 Amended Articles also authorized Turan to issue 100 Million shares. On 2/22/07, the Articles were amended to authorize the issuance of 150 Million shares. On 3/4/08, the Articles were amended to authorize the issuance of 200 Million shares. Currently, there are approximately 113 Million shares of Turan stock issued and outstanding. Additionally, there are approximately 40 Million shares of stock options issued and outstanding.

Mr. Vanetik was Turan's President from the Company's inception through about May 2008. Mr. Van Duren was Turan's Secretary and Treasurer from about November 2004 to May 2008. (Yuri Vanetik was the Secretary from April 2001 to about December 2004 and Tony Vanetik was the Treasurer to about November 2004.)

Mr. Vanetik is the Chairman of the Board of Turan. In or about June 2008, the following new officers were appointed:

| | | |
|---|---|---|
| 1. | President and CEO | Askar Karabayev |
| 2. | Chief Exploration Officer | Coy Squyres |
| 3. | VP of Business Development | Tom Jacky |
| 4. | VP of Operations | Naum Voloshin |
| 5. | Secretary & Treasurer | Robin Bisarya |
| 6. | VP of Administration and Technical Support | Alex Striganov |

The Company had virtually no operations until 2004, when it entered into the oil and gas industry by recruiting new management and acquiring Turan EnerPetroleum, LLP ("TEP"), organized and domiciled in the Republic of Kazakhstan. TEP is the holder of a license granted by the Kazakhstan government (the "Concession") to explore and extract hydrocarbons in a territory consisting of over 5,000,000 acres located in South Kazakhstan (close to China and Uzbekistan).

In June 2006, Turan entered into certain agreements with Terralliance Resources, Inc. ("TRI"). TRI is a privately held, institutionally controlled, international oil and gas exploration and technology company. It utilizes what it claims to be advanced

3

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

technology to increase the efficiency of the exploration efforts in oil and gas. In July 2008, the Turan-TRI agreements were renegotiated and the companies look forward to a productive relationship.

Since its inception, Turan has had no revenues, other than the receipt of proceeds from the sale of a piece of another concession for $300,000 to Russian Angel Acquisition, LLP. The Company's financial statements have not been audited since the end of 2005. Additionally, the Company has never filed tax returns with federal or state authorities. However, recently the Company has undertaken an internal audit of the Company's books and records.

II.    **Issue: Whether Certain Stock Transfers Relating to Trek Resources, the Bektayev Group, Karlan 111 and Pine Brook Were Authorized/Legal**

A.    **Facts Relevant to the Issue**

***The "Trek" Transactions***

By way of background, on March 26, 2005, Turan entered into a contract with Kazenercom (a Kazakhstan LLC) and Yerkin Bektayev (collectively, the "Bektayev Group") entitled, "Turan Enerpetroleum Confidential Asset Purchase Agreement" (hereinafter, "TEP Agreement"). Under the TEP Agreement, Turan agreed to purchase 100% of TEP's assets in exchange for the payment of 26,181,372 Turan shares to the Bektayev Group.

Turan paid the Bektayev Group under TEP Agreement by forming Trek Resources, Inc. ("Trek") to house most of the shares. Trek, formed in April 2005, is a Nevada corporation. Bektayev was initially the President, Secretary, Treasurer and sole director. Turan paid the Bektayev Group under TEP Agreement by effecting the following Turan stock transfers:

| | | |
|---|---|---|
| Bektayev: | | 2,618,138 |
| Trek: | | 24,381,862 |
| | **TOTAL:** | **27,000,000**[1] |

In about May 2006, the Bektayev Group (through Kazenercom LLC) filed a lawsuit against Turan in Kazakhstan alleging that pursuant to a Nominal Purchase Agreement between the Bektayev Group and Turan, dated May 25, 2005 (two months after the TEP Agreement), Turan was obliged to pay Kazenercom for its 49% interest in

---

[1] By letter dated June 2, 2006, the transfer agent (Empire) confirmed that Bektayev received his shares on May 3, 2005 (certificate no. 83); and Trek received its shares on July 12, 2005 (9,800,000 shares/certificate no. 93) and August 22, 2005 (14,581,862 shares/certificate no. 95).

4

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

TEP's nominal capital a total of 49,000 KZT (roughly $400 USD), *plus* $450,000 USD in accordance with additional terms *not* mentioned in the Purchase Agreement.  In July 2006, the Court issued a Decision (the "July 2006 Court Order") ruling in favor of Turan finding that the Nominal Purchase Agreement was ancillary to the TEP Purchase Agreement.

Significantly, the July 2006 Court Order also found that the Bektayev Group had received adequate and fair compensation for the TEP asset sale because they had received 27 Million Turan shares as represented by Turan's President in a letter dated July 13, 2006 which was submitted to the Court.  [The July 2006 Court Order and July 13, 2006 Letter (both translated into English) are attached hereto as **Attachment "A"**.]

An appeal and two more lawsuits were filed by the Bektayev Group against Turan.  The second lawsuit resulted in the Bektayev Group getting back the 49% TEP stock ownership interest in about March 2007.  The third lawsuit by the Bektayev Group was an attempt by them to get the remaining 51% TEP stock ownership interest.   The initial court decision resulted in an award of the remaining 51% to the Bektayev Group.  Although the time to appeal this award had expired, through certain Kazakh contacts obtained by the current President of Turan and Karlan 111 (hereinafter, "Karlan"), a belated appeal was successfully lodged and Turan got back its 100% ownership interest in TEP.[2]  This was an important  victory for Turan because TEP (along with its exploration and drilling license), was (and is) Turan's only significant asset.

The net result of the events is that Turan is obligated to pay the Bektayev Group a total of 27 Million shares and to pay Karlan 111 a total of 35 Million shares.  However, a review of Turan's transfer agent records and other documents show that the 24,381,862 Turan shares held in Trek's name for the benefit of the Bektayev Group were transferred to persons *not* for the benefit of the Bektayev Group and in apparent violation of the July 2006 Court Order.  Unbeknownst to the Bektayev Group and through certain activities that are not currently known by Turan's senior management staff, Bektayev was somehow removed as President, Secretary, Treasurer and sole director of Trek in April 2006 and the following replacement officers and directors were appointed:

| | |
|---|---|
| President: | Sergey Lipatov (replacing Bektayev) |
| Secretary: | Anatoly Vanetik (replacing Bektayev) |
| Treasurer: | Anatoly Vanetik (replacing Bektayev) |
| Directors: | Sergey Lipatov and Alexy Stojarov (replacing Bektayev) |

---

[2] Karlan has significant contacts in Kazakhstan which are also important to the retention of the licenses held by TEP.  For these services and as further detailed in the "Confidential Turan Petroleum Consulting Subscription Agreement for Karlan 111," dated February 15, 2008, Turan was required to pay Karlan 35 Million shares of Turan.

5

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

Thereafter, in October 2006, Alexander Kushnirenko became the new president, treasurer and director of the company and Asylkhan Burbayev became the new secretary of Trek. According to emails dated October 26 and 31, 2006, these changes were assisted by Mr. Vanetik. The emails are attached as **Attachment B**.

Pursuant to undated Irrevocable Stock Powers that are signed by Mr. Kushnirenko, Trek was divested of all of its Turan stockholdings and the shares were transferred to three entities controlled by *Karlan* as payment for the contract between Turan and Karlan (referenced above) and to *Hines Investments, SA* ("Hines"). According to Articles of Incorporation for Hines that Mr. Karabayev received from Mr. Vanetik, Hines is a Panama corporation.

The Karlan companies received approximately <u>16 Million shares</u> and Hines received approximately <u>8.4 Million shares</u>. Hines transferred approximately 6.24 Million of its shares to two companies, which were further distributed to various investors.

These transfers are apparently invalid because the shares should have remained with Trek (i.e., the Bektayev Group) according to the July 2006 Court Order. Additionally, the legality of the new Trek officer/director appointments is an open question given that Bektayev (the original and sole officer/director of Trek) has no knowledge of these appointments and would strenuously oppose them. Additionally, even assuming Bektayev was legally removed without his knowledge (if for example 100% of Trek's shares were owned by another person), Bektayev is likely to claim that he was fraudulently induced to transfer his shares to Trek as a result of false or misleading representations made by agents of <u>Turan</u> that the Turan shares would remain in Trek for the benefit of the Bektayev Group. Bektayev's attorneys have already threatened lawsuits as they have recently learned that something is amiss, as discussed below.

Below is a flow chart detailing the Turan stock transfers away from Trek to various persons:

[THIS SPACE INTENTIONALLY LEFT BLANK.]

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

## Stock Transfers From Trek (Bektayev) to Various Persons



**TREK**

24,381,862 shares received (July/Aug 2005) as required by July 2006 Court Order

*Trek*
*Transfrs/Sells*

**Pington Inv. (Karlan)**
5,333,000 shs (8/07)

**Varrial Fin. (Karlan)**
5,333,000 shs (8/07)

**Coast Fin. (Karlan)**
5,333,000 shs (8/07)

**Hines Inv. SA**
8,382,862 shs (10/07)

*Hines*
*Transfrs/Sells*

**Private Equity Mgt ("PEM")**
4,240,000 shs (2/08)

**888 Capital LLC**
2,000,000 shs (3/08)

**Hines**
2,142,000 shs (bal.)

*PEM Transfrs/Sells*

1. **Nhung Thi Nguyen**
   35,000 shs (3/08); transfr req'd by NRG
2. **Bui Nevada LLC**
   100,000 shs (3/08); transfr req'd by NRG
3. **Vivian Nguyen**
   80,000 shs (3/08); transfr req'd by NRG
4. **Christian Lising**
   20,000 shs (3/08); transfr req'd by NRG
5. **Le 888 Dynasty**
   83,333 shs (3/08); transfr req'd by NRG
6. **Kevin Jones c/o Brightstone**
   250,000 shs (3/08); transfr req'd by NRG
7. **Judy P. Trinh**
   20,000 shs (3/08); transfr req'd by NRG
8. **Delta Fine Chemicals**
   1 Mil shs (3/08); transfr req'd by NRG
9. **KMPP Partners**
   2 Mil shs (3/08); transfr req'd by NRG
10. **3 Point Investment**
    20,000 shs (4/08); transfr req'd by Turan
11. **Fami-Lee Investment**
    46,000 shs (4/08); transfr req'd by Turan
12. **Tiffany Yenphan**
    14,290 shs (4/08); transfr req'd by Turan
13. **Minh Tran**
    2000 shs (4/08); transfr req'd by Turan
14. **PEM**
    569,337 shs (balance as of 4/08)

7

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

## The "Pine Brook" Transactions

With regard to Turan's Agreement to "pay" Karlan 35 Million shares of Turan, 10 Million of those shares were transferred to Pine Brook (or Brooke) as evidenced by transfer agent records and various documents. Pine Brook is _unrelated_ to Karlan. This transfer was facilitated by a letter to Turan, dated February 22, 2008, and allegedly signed by Manat Torbergenova, a principal of Karlan (the "alleged Torbergenova Letter" or "Letter"). The alleged Torbergenova Letter is in English; however, Ms. Torbergenova does not speak or read English (she speaks Russian). Turan's current President (Askar Karabayev) questioned Ms. Torbergenova about the Letter and she stated that the signature was not hers and that it is a forgery. The Letter instructs Turan to issue 35 Million shares as follows:

1. Pine Brook, SA (Panama City, Balboa Plaza, Panama:  10 Million shares);

2. Varrial Financial Trading (affiliated with Karlan):  10 Million shares;

3. Karlan 111:  15 Million shares.

The alleged Terbergenova Letter was obtained from Bob Van Duren, attached to an email from Mr. Van Duren to Turan's senior management, dated July 8, 2008 ("Van Duren Email"). The Letter and Van Duren Email are attached to this memorandum as **Attachment "D"**. In the Van Duren Email, Mr. Van Duren states, among other things the following:

"On February 15, 2008 we passed a Board resolution regarding entering into a contract with Karlan 111 obligating Turan to issue 35,000,000 shares in return for services provided by Karlan 111. ...

Tony [Vanetik] asked me to prepare a resolution to issue the shares in the name of 3 separate companies. Since this was a change from the name of the entity that we had executed the contract with (Karlan 111) I asked Tony to get an instruction letter from Karlan 111 instructing Turan to issue the shares in the names Tony had provided. He provided me with the attached instruction letter on February 22 [the alleged Toberbergenova Letter]. ...

If a mistake was made in the issuance of the shares it needs to be resolved. ...

In reviewing the records from the transfer agent I see 3 separate certificates were issued as a result of the board action regarding the 35,000,000 share transaction. One of the certificates is # 296 issued in the name of Pine Brooke SA in the amount of 10,000,000 shares. On 4-17-08 the transfer agent broke certificate # 296 into several different certificates. 1,000,000 shares were issued into new names represented by 4 separate certificates numbered 334, 335, 336,

8

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

and 337. The balance of 9,000,000 shares were reissued into the name of Pine Brooke SA represented by certificate # 333. On 4-22 the transfer agent cancelled certificate number 333 and reissued certificate # 340 in the name of Pine Brook SA in the amount of 9,000,000 shares. As you may notice this is a slightly different spelling.

Mr. Van Duren goes on to advise that a freeze be placed on the shares relating to the Pine Brook transfer.

As referenced in the Van Duren Email, and reflected in transfer agent records, the 10 Million shares issued to Pine Brook were broken up and 1 Million of the shares was issued to four (4) recipients, all of whom have the same address in Switzerland. The recipients of the 1 Million shares apparently have no affiliation with Karlan. Three (3) of the certificates are in the name of "Article Second Trust" and one of the certificates is in the name of "Elizabeth Fago Revocable Trust."

<u>Turan, in consultation with corporate counsel, has placed a freeze on the certificates relating to the Pine Brook transfers, pending Turan's continuing inquiry into this matter. Additionally, in light of the other questionable transfers, Turan has instructed the transfer agent to get all stock transfer requests pre-approved by Turan's Secretary (Robin Bisarya) until further notice.</u> This was done to prevent the continuation of activities that might be in contravention of federal and state securities laws, among other things.

As regards the identity of Pine Brook, the Terbergenova Letter indicates that it is Panama corporation (like Hines). Mr. Van Duren also stated that Pine Brook is a Panama Corporation. Transfer agent records report that Pine Brook's address is the United States is the same as NRG's (which is Turan's former address), i.e., 3720 South Susan St., Santa Ana, CA. According to bank wire transfers relating to the "Sam Lee" transaction, discussed below, Pine Brook has a bank account in Switzerland.

### B.    <u>Problems and Solutions</u>

### 1.    *Concise Statement of the Problem*

Substantial shares of Turan (24,381,862 ) have been transferred out of Trek in apparent violation of the July 2006 Court Order. Most of those shares (15,999,0000) were transferred to entities controlled by Karlan pursuant to a contract between it and Turan. If the transfers of Turan stock away from Trek are illegal, then the stock transfers to Karlan are invalid. This further results in a failure by Turan to pay the consideration it owes to Karlan under the contract, potentially threatening to undermine an important relationship and trigger a lawsuit.

Additionally, assuming that Bektayev or Trek never had a right to the 24,381,862 shares, why were they not returned to Turan and cancelled?

9

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

## 2.   *Why the Problem Is Significant*

1. The appointment of Trek's current officers/directors and the removal of Bektayev may not be legal because Bektayev (Trek's sole officer/director at the time of the appointments/removal) did not authorize these actions. If the removal of Bektayev was not legal, the divestment of Trek's stockholdings in Turan is not legal; nor are the subsequent transfers to Karlan, et al. Additionally, if any Turan officers or directors facilitated any illicit activities, Turan will likely be the subject of regulatory scrutiny and private lawsuits.

2. Karlan is an important partner for Turan as it has key contacts in Kazakhstan, which are essential for TEP's retention of its license. Additionally, Karlan provided valuable services for Turan with regard to the lawsuits by the Bektayev Group and TEP's renewal of its license with the Kazakh government. If Turan's relationship with Karlan is compromised, lawsuits are likely and TEP's license (Turan's only significant asset at this time) would be in peril.

3. Attorneys for the Bektayev Group have contacted Turan threatening a lawsuit because they have received information that Bektayev no longer has any interest in Trek.[3] At this point, Bektayev's attorneys do not know that all of the Turan shares have been transferred out of Trek. A lawsuit is practically certain if they become aware of this fact.

4. Registration Issues:  The sales by Private Equity Management, Inc. ("PEM") (which is apparently not a broker-dealer) to 14 persons raises issues of whether PEM acted as an unregistered broker-dealer and/or sales agent in violation of state and/or federal laws.[4]  Additionally, if PEM purchased the shares with a view towards

---

[3] Specifically, one of Trek's current officers, Mr. Lipatov, sent a letter to attorneys for the Bektayev Group (Rutan Tucker in New York) stating that Mr. Bektayev has no interest in Trek.

[4] Brokers and dealers in securities are required to register with the SEC.  Similarly, each state has its own requirements for broker/dealer registration. Under federal law, a "broker" is any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank. A "dealer" is a person engaged in the business of buying and selling securities for his own account, through a broker or otherwise.

Issuers (i.e., companies) generally are not "brokers" because they sell securities for their own accounts and not for the accounts of others. Issuers generally are not "dealers" because they do not buy and sell their securities for their own accounts. Persons associated with issuers could be brokers is they receive transaction based compensation.

ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

distribution and there is no exemption available, this raises issues of compliance with securities registration requirements.[5]

## 3.    Action Items and Proposed Solutions

Action Item(s)

1.  Obtain answers to the following questions as soon as possible:

- How was the removal of Bektayev and appointment of new officers and directors for Trek accomplished and by whom (i.e., confirm whether legal; get copy of Trek's Bylaws)?

- With regard to the recipient of the Trek shares (other then the Karlan companies, who are known), ascertain:  (1) general information regarding the identity of the persons (i.e., who controls the entities, are the individuals affiliated in any way with Turan or any of its control persons); and (2) what consideration if any was paid by the recipients of the shares.

- Who controls Pine Brook and why did Pine Brook receive shares earmarked for Karlan?[6]

- Who controls Hines and what consideration, if any, did Hines pay for the Turan shares it received.

Proposed Solution(s):

---

With regard to Finders, the SEC's interpretation of the finder's exemption is predicated on the finder merely making available to the issuer, by introduction or otherwise, the identity of interested investors, and on the absence of certain factors (i.e., participation in negotiations, counseling investors of the merits of investing, recommending the investment to investors, receiving compensation based on a percentage of the offering proceeds, holding securities or cash, conducting sales efforts).

[5] PEM is not to be confused with Private Equity Management Group (hereinafter, "PEMGROUP"). PEMGROUP is a global private equity investment firm located in North America and Asia, with over US$4 billion in assets under management and over 100 investment professionals worldwide. Turan has learned from PEMGROUP that it believes it has a cause of action against PEM for improper use of its corporate name. PEMGROUP has apparently received calls from Turan shareholders who have stated that PEM is essentially posing as PEMGROUP, triggering the possibility of further lawsuits in which Turan could get looped in (even if Turan engaged in no wrongdoing).

[6] The Company's Secretary has put forth substantial efforts to get these and related questions answered and has encountered roadblocks. Consequently, in the absence of a legal action, it may not be possible to get these questions answered.

11

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

1. Cancel all of the shares (24,381,862) that were issued as a result of the divestment of all of Trek's stockholdings in Turan (unless immediate responses are received as to the above-listed questions indicating that a different action is appropriate).

2. Re-issue to Trek new shares of Turan totaling 24,381,862 (unless immediate responses are received as to the above-listed questions indicating that a different action is appropriate).

3. Cancel the 10 Million shares that were issued to Pine Brook (and re-issued to various Swiss accounts) and issue 10 Million shares to Karlan or its designee(s) (unless immediate responses are received as to the above-listed questions indicating that a different action is appropriate).

4. Re-issue to Karlan (or its beneficial designees) new shares of Turan totaling 15,999,000.

5. Send letters to each of the recipients of Turan shares apparently belonging to Trek notifying them that: 1) their Turan certificates have been cancelled pending an internal audit; 2) their shares will immediately be re-issued to them pending receipt and evaluation of certain requested information, as appropriate.

6. Return all of the Turan shares (24,381,862) back to Trek and re-issue new Turan shares (15,999,000) to the three entities controlled by Karlan. Additionally, re-issue Turan shares to those who are legally entitled to them (i.e., recipients who have "fully paid for" the Turan shares they received).

7. Adopt corporate governance documents (i.e., Corporate Governance Guidelines, etc.) and establish a Finance and Audit Committee as soon as possible to evaluate these and other issues referenced in this memorandum.

8. Continue to require Turan's transfer agent to obtain pre-approval by Turan's Secretary for all stock transfer requests, until Turan completes its investigation into the questionable stock transfers.

III. **Issue: Adequacy of Disclosure to Investors; Questionable Uses of Turan's Funds**

    A. **Facts Relevant to the Issue**

        Turan's PPM does not disclose the risks and uncertainties relating to Turan's primary asset (TEP) as a result of the Bektayev litigation and use of investor proceeds. While the PPM makes a general reference to the Bektayev litigation,[7] it goes on to state,

---

[7] The PPM dated February 2007 states, "The Company initiated litigation in the United States against a Kazakhstan national and a Kazakhstan based company. In addition,

# ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL

"The Company does not believe that the Legal Proceedings it is currently involved in will have a material impact on its business."

During the time Turan was in litigation with the Bektayev Group (from about May 2006 to September 2007), Turan was at risk of losing its sole asset (TEP). Further, various court orders (that were subject to appeal and eventually overturned) found that Turan did not have a right to all or part of its claimed ownership interest in TEP (from about March 2007 to September 2007).

Turan's only asset (TEP) apparently remains at risk because the Bektayev Group has not received the 24,381,862 shares of Turan required by the July 2006 Court Order. If the Bektayev Group learns that all of these shares have been transferred out of Trek and into the hands of other persons, a lawsuit is highly likely. This could, again, jeopardize Turan's only asset. Specifically, If a Kazakh Court finds that Turan violated the July 2006 Court Order, there is a substantial risk that the Court could issue rulings negatively impacting Turan's interest in TEP or otherwise penalizing Turan.

During the pending litigation with the Bektayev Group, a substantial number of Turan shares (8,382,862 ) were sold to various institutions and individuals, as detailed in the chart above. Additional shares were sold to other investors. There are no versions of Turan's private placement memorandum identified to date that disclose the Bektayev litigation, the substantial threat that Turan might lose its only asset and the fact of court rulings that found against Turan as to all or part of its claimed ownership interest in TEP. Failure to disclose these facts will likely be viewed as a material omission of fact under federal and state securities laws.[8]

Turan's internal audit (the details of which are addressed in the next section of this memorandum) found that shareholder proceeds were used to pay expenses incurred by other persons and not for the Company's Concession. Information is still being gathered by the Company on this issue; however, the Company has a obtained historical document indicating that a significant amount of funds from Turan's checking account were distributed for uses inconsistent with PPM disclosures regarding use of

---

the Company has been the defendant against litigation initiated in Kazakhstan by the same individual and entity. The parties recently reached an agreement to end all of the outstanding litigation. ..."

[8] Facts are material if a reasonable investor would consider them important in making an investment decision and would view disclosure of them as significantly altering the total mix of information made available. The "materiality of information relating to a company's financial condition, solvency and profitability is not subject to serious challenge." *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980), cited by us in Charles E. French, 52 S.E.C. 858, 863 n.19 (1996). See also, *Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir. 1996) ("Material facts include . . . those facts which affect the probable future of the company.") (quoting SEC v. Texas Gulf Sulphur Co., 401 P.2d 833, 849 (2d Cir. 1968)).

13

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

proceeds. The PPM states that all net proceeds will be used to develop the Concession.

According to historical Company ledgers and the Company's former accountant (Mary Taylor), Turan paid expenses attributable to NRG Resources Corp. ("NRG") totaling $413,330.00. Additionally, an employee of Turan for several years specifically identified a number of expense items paid for by Turan that were not for the benefit of Turan. Such items included, among other things, the following payment:

1. $50,000.00 payment to Gintautas Vileita (apparently related to an "aluminum deal" having nothing to do with Turan);

2. $98,000.00 in payments to a law firm representing NRG;

3. $150,000.00 payment to Judy Trinh (the wife of former Turan Secretary, Hiep Trinh); and

4. $7,000.00 payment to Len Futaba, an employee of NRG.[9]

**B.   Problems and Solutions**

**1.   Concise Statement of the Problem**

Whether Turan shareholders received adequate disclosure regarding: (1) the Bektayev litigation and the threat it posed (and possibly continues to pose) as to Turan's sole asset (TEP); and (2) use of proceeds.

**2.   Why the Problem is Significant**

Failure to disclose material information to investors and/or making materially misleading statements constitutes fraud under federal (SEC) and state securities laws. Even if this did not actually occur, red flags or highly suspicious activities indicating that it has occurred expose Turan to private lawsuits and possible investigation (or prosecution) by the regulators (i.e., the SEC and/or state regulators).

**3.   Action Items and Proposed Solutions**

*Action Item(s)*

- Obtain answers to the questions outlined in Section II.B.3, above, and IV.B.3., below.

---

[9] Most recently, in June 2008, an unmistakably improper expense was charged to Turan (i.e., Victoria's Secret). Though the amount was small and reimbursement was received after the incident was called to the attention of NRG, this occurrence underscores the need for immediate implementation of internal controls and corporate governance policies and procedures.

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

*Proposed Solution(s):*

- Revise Turan's PPM as soon as possible.

- Send out a shareholder letter with an update of current and past events, if appropriate and as additional information is obtained.

- If an investor complains and depending upon the basis for the complaint, consider settling the matter by offering to rescind the transaction, if appropriate and in consideration of the merits, litigation risk, cost of litigation, and negative publicity.[10]

- Adopt strong corporate governance policies/procedures and internal controls addressing shareholder disclosure issues.

IV.   **Issue:  Commingling; Internal Controls and Recordkeeping**

   A.   **Facts Relevant to the Issue**

   As noted above, Turan's ongoing internal audit has identified significant expenses paid by the Company via checks and wire transfer that may not have been appropriate.[11]  Additionally, with regard to the total amount of money raised by Turan, corporate records received to date state that total a total of $15,237,082 worth of Turan shares were sold for a combination of cash and services.  Total cash received by Turan amounts to $2,635,610, according to records received to date.  Additionally, the internal audit has been able to identify only $5,193,466 worth of services received.  Additionally, sales by third parties of their Turan stock have resulted in the receipt of far more cash than Turan has ever raised to date (for example, see Sam Lee Transaction, below).  Turan's Secretary is continuing to seek answers to these issues by working with NRG employees and others.  This task is complicated by the fact that segregated bank accounts were apparently not kept for Turan and NRG.

   Additionally, records were apparently not kept of whether a given expense was attributable to Turan only, NRG only or a joint Turan/NRG expense.  Turan's former accountant stated that she attempted to obtain this information from the companies but was unable to get responses from them.  Consequently, the ledgers that she did keep do not have the requisite detail.  That said, separate historical ledgers were kept of expenses submitted by NRG and expenses submitted by Mr. Vanetik for disbursements from Turan checking account.  As noted above, the NRG ledger shows expenses for the

---

[10] Turan has received complaints from certain investors through their attorneys who have questioned, among other things, Turan's recordkeeping and stock transfer.  Those matters are being handled by corporate counsel.

[11] The checks were apparently signed by Mr. Vanetick and the wires were apparently sent by an NRG employee (Haneczka Czernaichowski).

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

period $413,330.00 for the period February 2005 to May 2008. The Vanetik ledger shows expenses of $1,781,962.00 for the period February 2005 to May 2008. Turan's Secretary has not yet been successful in his continuing efforts to obtain details for these ledgers.

During Turan's internal audit, Turan's Secretary/Treasurer further requested copies of the Company's historical minutes of all meetings of the board of directors in order to reconstruct the purpose of various significant expenditures and understand the basis for Turan's issuances of substantial amounts of shares (including the stock transfers discussed above). As noted above, to date, Turan has issued a total of approximately 113 Million shares. The minutes received by the Secretary are summarized in a document entitled, "Turan Board of Directors Meeting Summary." This document is attached hereto as **Attachment "E"**. Some of the actual minutes are unsigned, do not identify the attendees and do not include any details, making it difficult to reconstruct certain events. For example, an entry on 12/14/04, states "Dean Miller 1,600,000 shares." It is not clear from the corresponding minutes the nature of the benefit received (or to be received) by Turan. Consequently, it is unclear whether these and many other Turan stock issuances were fully paid, as required.

Additionally, millions of stock options were granted to persons apparently not involved with Turan or with no apparent benefit to Turan. Many of these stock options are not referenced in Turan's board of directors minutes or board actions.

***The Sam Lee Transaction***

A high net worth individual with whom Mr. Karabayev had done business, Sam Lee, told Mr. Karabayev that he was interested in investing in Turan. Mr. Karabayev, who was pre-occupied with various business matters, introduced Mr. Lee to Mr. Vanetik and Hiep Trinh to raise money for Turan. Subsequently, Mr. Lee purchased 1 Million shares of Turan for a purchase price of *$3.80* per share, for a total purchase price of $3.8 Million. However, Mr. Lee apparently purchased his shares from Essex Management, not Turan (which has been and continues to be in need of capital). (The PPM in effect at the time had a purchase price of *$5.00* per share.)

Records obtained by Turan include a Confidential Private Stock Sale Agreement between Essex Management and Mr. Lee ("Essex/Lee Agreement"), dated February 1, 2008, attached hereto as **Attachment F**. The signor on the Essex/Lee Agreement is Sergey Polyanichkin. According to Alex Striganov (Turan consultant who also worked in NRG's offices), Mr. Polyanichkin is involved in an aluminum deal in which Mr. Vanetick is involved. According to emails and other documents obtained during Turan's internal audit, included in **Attachment G**, Mr. Yuri Vanetik is affiliated with Essex. These documents also reflect a Turan Board Action (with Mr. Vanetik and Mr. Van Duren as signors), dated July 5, 2005, approving the issuance of 10 Million shares to Essex at $6.00 per share payable in a combination of cash and "financial consulting services relating to the raising of capital for [Turan] outside of the United States ...."

16

**ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL**

Mr. Lee paid for his shares via three bank wires dated February, May and June 2008, totaling $3.8 Million (substantially more than total cash apparently ever raised by Turan through its sale of shares – i.e., $2.6 Million). <u>The money ($3.8 Million) was wired to a Swiss bank account in the name of "Pine Brook."</u>  The wire transfer requests are included in **Attachment F**, referenced above.

As a result of these transactions, Turan missed the opportunity to raise millions of dollars.  Mr. Karabayev stated that he was unaware of these transactions until Mr. Lee happened to bring them to his attention.  Mr. Karabayev further stated that he was deeply concerned about the Sam Lee transactions because Turan really needed these funds to fulfill its obligations under the contract for exploration on ARYS block with the government of Kazakhstan.

### Continuing Internal Audit of the Issues

Turan recently sent out questionnaires to shareholders in an attempt to ascertain the identity of certain shareholders and whether consideration had been paid by the shareholder.  One of the responses states that the shareholder did not pay for the shares he received.  The questionnaire response is attached hereto as **Attachment "H"**.  The Company continues to collect and analyze information it has received to provide further answers.  However, substantial facts have already been verified by the Company as detailed herein.

### B.   <u>Problems and Solutions</u>

#### 1.   Concise Statement of the Problem

Turan's recordkeeping and internal controls have raised serious questions regarding proper use of Turan's funds and whether other activities were proper and/or authorized.

#### 2.   Why the Problem is Significant

Misuse of investor funds constitutes fraud under federal (SEC) and state securities laws.  Even if this did not actually occur, red flags or highly suspicious activities indicating that it has occurred expose Turan to private lawsuits and possible investigation (or prosecution) by the regulators (i.e., the SEC and/or state regulators).

The questionable recordkeeping and internal controls at Turan place the Company at risk for corporate abuse, which can in turn trigger lawsuits and regulatory scrutiny.

#### 3.   Action Items and Proposed Solutions

Additional information is needed for Turan to further assess the seriousness of the issues detailed above.  However, what is known to date demonstrates that Turan

17

# EXHIBIT  G

Account Summary                                                                 Page 1 of 1



**Basic Banking®**

Welcome **ROBIN BISARYA**
Role: **Administrator/User**

**Main Menu**

**Account Summary**

**Transfer Funds**

Account Summary

Active Group ▣
DEFAULT ▸▸▸

Try the CEO Mobile[SM] service!
Send the *CEO Mobile* link to
your mobile device in a text
message, an email, or both.

Note: Data charges by your
mobile carrier may apply.

☐ Send to my mobile phone

☐ Send to my profile email

[ Submit ]

To view an account's transaction history, please click on the account's
available balance or outstanding balance.

▣ For more information

Printer Friendly Version

**Cash Accounts**

| Account Number | Account Name | Beginning Day Balance | Available Balance ▣ |
|---|---|---|---|
| 313-8162700 § | Basic Business Checking | $12.00 | $12.00 |
| 265-3846101 § | Business Checking | $501,243.63 | $6,243.63 |
| 573-8215283 § | Business Checking | $4,004,792.58 | $3,999,792.58 |
| | Totals | $4,506,048.21 | $4,006,048.21 |

§  BUS808: Balance displayed may not reflect transactions completed today.

Contact Us | Help
© 2002 - 2007 Wells Fargo. All rights reserved.

As of February 5, 2009, next day after the Notice of
Shareholders' Meeting convened for February 19, 2009